19259

Charles E. ROBINSON, Jr., Individually, and representing the taxpayers of the City of Greenville, South Carolina, Appellant, v. R. Cooper WHITE, Jr., as Mayor; James H. Simkins, Joe F. Jordan, R. E. Gregory, Max M. Heller, Joseph R. Bryson, Jr., and Wayne Wuestenberg, constituting the members of the Greenville City Council; the City of Greenville, a municipal corporation; and Daniel R. McLeod, as Attorney General of the State of South Carolina, Respondents.

(182 S. E. (2d) 744)

*Robert A. Clay, Esq.,* of Greenville, *for the Plaintiff-Appellant,*

*W. H. Arnold, Esq.,* of Greenville, *Sinkler, Gibbs, Simons & Guerard,* of Charleston, and *Timothy G. Quinn, Asst. Atty. Gen.,* of Columbia, *for the Respondents,*

July 28, 1971.

LITTLEJOHN, Justice.

This declaratory judgment action was instituted by the plaintiff on his own behalf and representing the taxpayers of the City of Greenville to enjoin the pledging of moneys derived from business license taxes, in the City of Green-

ville, for securing revenue bonds to be issued by the City for the purpose of constructing off-street parking facilities. The defendants are the Mayor and City Council of the City of Greenville and the Attorney General of the State of South Carolina.

In his complaint the plaintiff alleges that the Mayor and City Council of Greenville propose to issue $5,500,000.00 of revenue bonds of the City of Greenville in accordance with the Revenue Bond Act (Sections 59-361 to 59-415, inclusive, Code of Laws of South Carolina, 1962, as amended).

In addition, plaintiff alleges that the defendants, Mayor and City Council, also intend to utilize the "Off-Street Parking Facilities Act" (Sections 59-566 to 59-566.5, inclusive, Code of Laws of South Carolina, 1962, as amended) (hereinafter referred to as the "Act"), which authorizes a municipality to pledge as additional security for revenue bonds issued, to build off-street parking facilities, so much of the moneys derived from business license taxes as may be necessary to pay the principal of and interest on the revenue bonds, to the extent that revenues from on-street and off-street parking are insufficient to meet said principal and interest payments.

Plaintiff alleges that in the event moneys from business license taxes are used to pay the revenue bonds, such moneys will be unavailable for the payment of the general expenses of the City to which they are now applied, with the result that additional moneys from property taxes will be necessary to pay the expenses of the City. It is plaintiff's position that to the extent that such moneys from business license taxes are used, the bonds will constitute "bonded debt" within the meaning of Article VIII, Section 7, of the South Carolina Constitution, and that therefore Section 59-566.5 (1A) of the Act is unconstitutional in that it allows the City to incur bonded debt without a favorable vote as to the creation thereof by the qualified electors of the City. Plaintiff also alleges that Section 59-566.5 (1A) is uncon-

stitutional in that it allows the City to pledge revenues derived from business license taxes to an unrelated project.

Defendants in their Answer admit that the City proposes to issue the aforesaid revenue bonds, and intends to utilize the authorization embodied in the Act to pledge as additional security for the bonds, such moneys as may be necessary from the City's business license taxes. Defendants deny such a pledge constitutes bonded debt within the meaning of Article VIII, Section 7, of the South Carolina Constitution and deny that Section 59-566.5 (1A) is unconstitutional as being in conflict with Article VIII, Section 7, or by virtue of its allowing a pledge of revenues to an unrelated project.

The lower court found "that the Off-Street Parking Facilities Act is constitutional in that the pledge of business license taxes authorized thereby does not violate Article VIII, Section 7 of the South Carolina Constitution." The injunction sought was denied. We reverse.

The relevant portions of the "Off-Street Parking Facilities Act" are as follows:

"§ 59-566.5. Further powers of municipalities as to bonds.

"(1) Provide that any revenue bonds issued under this article shall be payable, both as to principal and interest, from such portions of the revenues of either or both of its off-street parking facilities and its on-street parking facilities as the municipality shall prescribe in the proceedings adopted in the issuance of bonds pursuant to this article but any pledge with respect to revenues derived from on-street parking facilities shall reserve the right in the municipality to discontinue the use of on-street parking facilities whenever traffic conditions so require;

"(1A) Additionally secure the payment of the principal and interest of bonds issued pursuant to this article by a pledge of so much of the moneys as the municipality shall derive from business license taxes as may be necessary to pay the principal of and interest on any bonds issued under

this article, and covenant and agree that all powers granted to such municipality to impose business license taxes shall be exercised to such degree as will enable the municipality to discharge the covenant herein first authorized; * * *."

Under the terms of Section 59-566.5 (1) municipalities, including the City of Greenville, are authorized to borrow money by issuing revenue bonds for the purpose of constructing off-street parking facilities, and to pledge for the payment of bonds, revenue derived from the operation of the facilities. That part of the law is not challenged. Section 59-566.5 (1A) authorizes the city to pledge as additional security for the bond moneys borrowed, the business license taxes to the extent that revenues from operation of the facilities constructed are not sufficient to meet the payment. This part of the law is challenged.

The relevant portion of Article VIII, Section 7 of the Constitution of South Carolina is as follows:

"Article VIII, § 7. Bonded debt; certificates of indebtedness; sinking fund; refunding bonded debt; * * * No city or town in this State shall hereafter incur any bonded debt which, including existing bonded indebtedness, shall exceed eight per centum of the assessed value of the taxable property therein, and no such debt shall be created without submitting the question as to the creation thereof to the qualified electors of such city or town, as provided in this Constitution for such special elections; and unless a majority of such electors voting on the question shall be in favor of creating such further bonded debt, none shall be created: * * *"

The question which the court is called upon to answer is phrased in appellant's brief as follows:

"Is Section 59-566.5 (1A), South Carolina Code of Laws, 1962, as amended, unconstitutional as an attempt to authorize the creation of 'bonded indebtedness' by a city without compliance with the provisions of Article VIII, Section 7, of the South Carolina Constitution?"

If the code section is in conflict with the constitutional provision, bonds may not be issued until and unless the question is submitted to the qualified electors and approved by them in an appropriate election. The resolution of this one question hinges on a determination as to whether the pledge of business license tax revenue authorized by the Act and admittedly intended to be utilized by the City, in fact, or as a matter of law, constitutes "bonded debt" as that term is used in Article VIII, Section 7 of the Constitution of South Carolina.

It has been stipulated: (1) that the city proposes to issue $5,500,000.00 in revenue bonds, to the payment of which will be pledged the revenue derived from both on-street and off-street parking, including revenues from the facilities to be built with the bond money; (2) that the city proposes to pledge moneys derived from business license tax; (3) that on-street and off-street parking facilities will not be sufficient to pay the principal and interest, and to the exent that such revenues are not sufficient, principal and interest will be paid from revenues derived from business license taxes; (4) that, by estimation, in the first year of operation of the facilities approximately $313,000.00 of the business license taxes will be required in addition to the parking facilities revenue; (5) that in the fifth year of operation, approximately $154,000.00 will be required, and in the tenth year of operation, approximately $75,000.00 will be required; (6) and that shortly thereafter revenues derived from business license taxes will no longer be required to supplement revenues from parking facilities.

We first consider the purpose of the constitutional provision. It is designed to prevent city officials from borrowing money which taxpayers must repay without having first obtained their consent. The provision is a limitation on the authority of city government officials. It protects the city's financial structure, but more especially, it protects the taxpayers who form the city and must repay debts incurred.

The purpose of the constitutional limitation set forth in Article VIII, Section 7 is the same as the limitation set forth in Article X, Section 11. In the case of *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153 (1926), that purpose is described as follows:

"The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation."

If business license taxes may be pledged to the payment of revenue bonds as proposed, without consideration of the constitutional provision, then all municipal revenue derived from any source other than *ad valorem* taxes on property might likewise be pledged. If all such revenue was pledged the entire burden of current expenses would fall on the *ad valorem* taxpayer and the property owner would be called upon to carry the full burden of general fund obligations.

It would appear from a hurried calculation that over the first ten-year period more than one and one-half million dollars would be required from business license taxes, over and above revenues usable from parking lot facilities. It necessarily follows that general revenue funds presently swelled by collections of business license taxes would be depleted to that extent. If Greenville city government is to continue to provide facilities and services to its people, it is inescapable that such revenue would have to be replaced by an *ad valorem* tax or some other source of revenue. The other alternate is that services and facilities must be curtailed.

Obviously this court has no way of knowing with positive certainty what effect this plan of financing would have on the taxpayers of Greenville, but it is not realistic to assume that the budget would be reduced to the extent of $313,000.00 the first year, or corresponding amounts the subsequent years.

This proposal is unlike those wherein a city, at the time it creates a debt, creates the fund to pay it. Here, the city

proposes to use funds which would be otherwise available for general purposes.

It is the contention of the appellant that to the extent unrelated funds (business license tax) are used to service the bonds, the general funds of the city will be depleted and the city authorities will then look to the taxpayers to replenish the general fund. It is argued that the end result is that the taxpayer is burdened with payment of the bonds just as fully as if they had been issued as general obligation bonds in an amount equal to the unrelated funds pledged. We agree.

Neither the taxpayer nor this court can predict with exactness how the city council would solve the problem created by the depletion of funds, but we think there is a very real danger that in the final analysis it will be the taxpayer who bears the additional financial burden which would result. Whether the problem be solved by adding a new source of revenue, or increasing *ad valorem* taxes, or increasing other taxes already in existence, or by curtailing services, the people bear the brunt of the bond issue. The fact that, as a bookkeeping operation, the debt payments are made from the business license tax instead of from general funds does not alter the fact that the taxpayer foots the bill. Approval of the plan would effectively deprive the taxpayers of the constitutional protection afforded by Article VIII, Section 7. We think that the plan of financing and the pledging of the business license tax violates the spirit, if not the very letter, of the constitutional provision. It permits the city to do by indirection that which it could not do by direction. Under the stipulated facts, the constitutional guaranty is jeopardized with sufficient certainty to necessitate and require the intervention of this court. The taxpayer cannot wait until after the bonds have been issued, and until such time as it is positively proven that his rights have been violated, to seek relief from the court.

It is common knowledge that in city financing substantial revenues are derived from such collections as licenses, per-

mits, fines, forfeitures, sewer charges, and other similar sources. It is also common knowledge that property or *ad valorem* taxes are then added as needed to make up the difference to balance the budget.

At this time the plaintiff cannot with positive certainty prove that the *ad valorem* tax will be used to make up the depleted revenue and such proof is not required. We are convinced that the debt to the extent of the depleted revenue will fall at least indirectly upon people who pay taxes of various kinds to the city. It will fall upon such a large segment of the people as to effectually be the obligation of taxpayers generally.

This is a case of first impression in this state involving Article VIII, Section 7 and municipal financing. The cases involving Article X, Section 11 and state financing are of considerable interest but not controlling under the facts here.

In the case of *City of Trinidad v. Haxby, et al.,* 136 Colo. 168, 315 P. (2d) 204 (1957), the Supreme Court of Colorado had before it a situation quite similar to the one we must now determine. The city of Trinidad proposed to issue bonds to build a hospital and to pledge all net revenue from operation of the hospital, together with such part of the city's cigarette taxes, parking meter fees and unpledged revenue of its electric light and power system, as would be sufficient to pay the bonds and interest. The question arose as to whether such an obligation created a debt in the constitutional sense. That court said:

"In substance, the argument of Trinidad is that any and all municipal revenue derived from any source other than *ad valorem* taxes on property can be pledged for the payment of specific obligations contracted by the city, and that said obligations thus secured by first liens on specific revenues do not create 'debts' within the meaning of the constitutional prohibition. It does not require the wisdom of Solomon to point out that if the provision be so construed it would be possible to pledge all revenue other than prop-

erty taxes to financing 'projects and facilities' which may, or may not, be demanded by the inhabitants of a city and that the property taxes would then be called upon to carry the full burden of general fund obligations. Such taxes, already burdensome, would soon become confiscatory."

We conclude that Section 59-566.5 (1A) violates the provisions of Article VIII, Section 7 of the Constitution of South Carolina. It deprives the taxpayer of the protection afforded by the constitutional limitation.

Reversed.

Moss, C. J., and Lewis, J., concur.

Bussey and Brailsford, JJ., dissent.

Bussey, Justice (dissenting) :

The authorities cited in the order of the lower court and in the briefs of counsel clearly and fully support the judgment below, which should be affirmed. None of these pertinent authorities is discussed or attempted to be distinguished in the majority opinion.

For at least a half a century the terms "bonded debt" and "bonded indebtedness", contained in Article VIII, Sec. 7, and Article X, Sec. 5 of the Constitution have been consistently defined in numerous decisions by this Court. These terms signify a *primary obligation* of the particular political subdivision involved, secured *primarily* by an *ad valorem* tax levied upon all of the taxable property therein. Among other cases see: *Jackson v. Breeland,* 103 S. C. 184, 88 S. E. 128, 130; *Bolton v. Wharton,* 163 S. C. 242, 161 S. E. 454; *Thomson v. Christopher,* 141 S. C. 92, 139 S. E. 178; *Barnwell v. Matthews,* 132 S. C. 314, 128 S. E. 712; *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153.

The bonds in the instant case are secured primarily by revenues from the parking facilities; secondarily by a portion of the business license fees, and not at all by an *ad valorem* tax levied upon any taxable property. It clearly follows that these obligations do not constitute a "bonded debt"

within the purview of the Constitution, as such term has been consistently defined by this Court. Our prior definition is too firmly and well established to be currently discarded without even discussion.

Appellant argues that the diversion of a portion of the business license fees to help defray the cost of the bonds converts such into a "bonded debt" because of the possible contingency of an increase in *ad valorem* taxes resulting from such diversion. This contention is, I think, fully met and disposed of by the rationale of the opinion in the *Briggs* case and the various other cases therein cited and analyzed. The Colorado case of *City of Trinidad v. Haxby,* 136 Colo. 168, 315 P. (2d) 204, cited in the majority opinion, is not at all persuasive. Historically, there appear to be quite fundamental differences between the pertinent laws of that state and those of this state. But, even if such case be regarded as persuasive, it should not be followed without regard to, or discussion of, our own decisions.

BRAILSFORD, J., concurs.