## 21640

P. Duncan JOHNSON, and Roger Lloyd Jones, Individually and on behalf of all other persons similarly situated; and Town of Bamberg, South Carolina, Appellants, v. PIEDMONT MUNICIPAL POWER AGENCY; Clarence A. Shealy, Jr., John C. Eargle, Calvin T. Millstead, L. D. Gardner, Jr., Winifred Culclasure, Robert P. Coats, and Donald E. Morris, as mayor and members of the City Council of the City of Newberry, South Carolina, and representing the governing bodies of the member municipalities of the Piedmont Municipal Power Agency; Jack Millwood, Joe Dean Knuckles, Ronnie Brown, Dewitt McCraw, and Basil H. Clary, as the Commissioners of Public Works of the City of Gaffney, South Carolina, and representing the commissioners of public works of the member municipalities of the Piedmont Municipal Power Agency; Vernon L. Sanders, Frank Guyton, Fred Kirby, Kenneth W. Gaulman, Ray Clary, John Q. Little, and J. Chad Sarratt, as mayor and members of the City Council of Gaffney, South Carolina, and representing the governing bodies of the member municipalities of Piedmont Municipal Power Agency, Respondents.

(287 S. E. (2d) 476)

346

*Pope & Hudgens,* Newberry, *and B. Monroe Hiers,* Bamberg, *for appellants.*

*McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble,* Columbia, *Eugene C. Griffith,* Newberry, *and C. E. Saint-Amand, Michael R. Daniel and A. Ray Godshall,* Gaffney, *for respondents.*

February 10, 1982.

Ness, Justice:

This appeal tests the constitutionality of the Joint Municipal Electric Power and Energy Act of 1978 (the "Act")[1] and chal-

---

[1] Codified in Chapter 23, Title 6 of the Code of Laws of South Carolina, 1976, as amended.

lenges the validity of contracts executed under authority of the Act. We hold it constitutional.

## FACTUAL BACKGROUND

In 1975, Duke Power Company (Duke) offered to sell its power generating Catawba Nuclear Station, under construction near Lake Wylie in York County, South Carolina, to its wholesale municipal customers in North and South Carolina.

In March, 1978, Duke sold a part interest in the Catawba project to a joint agency composed of municipalities in North Carolina.[2] South Carolina, unlike North Carolina, had no legislation allowing municipalities to form a joint agency that could issue revenue bonds for financing a project such as Catawba. On April 17, 1978, legislation (the Act) was signed into law. Thereafter, twelve South Carolina municipalities formed a joint agency, the Piedmont Municipal Power Agency (PMPA), and pursued the feasibility of accepting Duke's offer to sell an interest in the Catawba project.[3]

By August, 1980, PMPA and Duke negotiated a sale. The contracts generally provide (1) that PMPA would purchase from Duke a 25 per cent undivided ownership interest in one of the two Catawba nuclear generators under construction,[4] (2) that PMPA would employ Duke to complete construction of the generator and to maintain and operate it thereafter, (3) that Duke would furnish support facilities services (e.g. laboratories, roads, parking, railroads) and transmission services, and (4) that Duke would repurchase from PMPA any excess power generated over the first fifteen years of commercial operation.

[2] The North Carolina Agency is a joint agency organized in 1976 under the provisions of Chapter 159B of the General Statutes of North Carolina. It has 19 participating municipalities.

[3] The twelve municipalities are: Abbeville, Clinton, Easley, Gaffney, Greer, Laurens, Newberry, Prosperity, Rock Hill, Seneca, Union, and Westminster. After the initial information of PMPA, the City of Greenwood petitioned to become a member of the agency and was admitted to membership by resolution of the PMPA Board of Directors in late 1979. Greenwood subsequently withdrew its membership in December, 1980. Prosperity withdrew its membership in March, 1980.

[4] The remaining 75 per cent is owned by the North Carolina joint agency. The expected useful life of the Catawba project is over forty years.

PMPA then offered to sell its newly contracted-for bulk power to each of its member municipalities. Ten municipalities accepted the offer. This new arrangement substituted PMPA for Duke as supplier of the municipalities' power.

To finance acquisition and completion of the construction of the generator, PMPA must issue revenue bonds totalling $675-767 million. PMPA's revenues would consist primarily of its sales to the participating municipalities at a rate set by PMPA sufficient to pay all of its project-related costs. The municipalities would be required to establish their own customer rates at levels sufficient to operate their power distribution systems and to satisfy the rate payments of PMPA. The payments would include amounts sufficient to service the bond issues.

Plaintiffs P. Duncan Johnson and Roger Lloyd Jones, taxpayers from two of the member municipalities representing themselves and all persons similarly situated, and plaintiff Town of Bamberg, a municipality not qualifying under the Act, brought this declaratory judgment action seeking declaratory and injunctive relief to prevent both the issuance of bonds by PMPA and the performance of the Project Agreements (between Duke and PMPA) and Power Sales Agreements (between PMPA and the municipalities).

The trial judge upheld the Act and the agreements. We affirm. This appeal followed.

## THE ACT

The purpose of the Act, as stated in the legislative finding, is to provide an economical and efficient method of producing energy not attainable by one municipality acting alone.

Subject to certain qualifications, a municipality may join hands as tenant-in-common with one or more municipalities in this State or another state, or any political subdivision or agency of any other state, in order to jointly provide electricity for its inhabitants. § 6-23-30. To participate, a municipality must acquire approval of an appropriate resolution or ordinance by a majority of the members of its governing body. Upon approval, notice of the resolution is publicized in a

newspaper, and any affected party may challenge the action by a *de novo* proceeding in the circuit court. § 6-23-40.

An application containing pertinent information about the joint agency is then filed with the Secretary of State, who may thereafter issue a corporate certificate recognizing the joint agency as a public body corporate and politic under State law. § 6-23-50.

The management and control of a joint agency is vested in a board of directors composed of one representative from each of the participating municipalities. § 6-23-70. The joint agency has the power, inter alia, to construct an energy plant, or to purchase an existing one, and to issue tax-exempt bonds of the joint agency to fund the project. § 6-23-90, § 6-23-230.

The bonds of PMPA are payable solely from the revenues collected by the municipalities from their customers; neither the full faith and credit nor the taxing power of the State or any municipality is, or may be, pledged for payment of the bond. § 6-23-210.

A municipality may be obligated to make payments to the joint agency even if the project never produces any energy. § 6-23-110. The payments shall be made from revenues derived from the operation of its electric system, and shall not invoke the municipalities' taxing power. § 6-23-110.

Bonds may not be issued to finance facilities owned wholly or in part by any private corporation. § 6-23-320.

## STANDARD OF REVIEW

In passing upon the constitutionality of legislative enactment, we are mindful of the proper framework for review:

> The legislative power of the general assembly is not dependent upon specific constitutional authorization. The State Constitution only limits the legislature's plenary powers. Thus, the general assembly may enact any law not prohibited, expressly or by clear implication, by the State or Federal Constitutions. See West's South Carolina Digest, Constitutional Law, Key 26.

Where the constitution allegedly limits or prohibits a legislative act, every reasonable presumption must be made in favor of the constitutionality of the act. Only where an enactment offends specific constitutional provisions beyond a reasonable doubt will we declare it unconstitutional. *State ex rel. McLeod v. Riley*, S. C., 278 S. E. (2d) 612 (1981).

Several constitutional challenges to the Act are before us. The effect of a particular constitutional provision should be determined in light of its relationship to the entire Constitution and not as a single isolated provision. *Knight v. Salisbury*, 262 S. C. 565, 206 S. E. (2d) 875 (1974).

Guided by the principles above, we proceed with our analysis of the Act in light of the questions presented.

## PUBLIC PURPOSE

Bonded indebtedness may be incurred only for a public purpose. Incidental benefits to private interest from the promotion of projects funded with bond money is not inconsistent with the overall public purpose. Article X, Constitution of South Carolina; *Hunt v. McNair*, 255 S. C. 71, 177 S. E. (2d) 362 (1970); *Elliott v. McNair*, 250 S. C. 75, 156 S. E. (2d) 421 (1967). We find no constitutional provision which prohibits municipalities from combining their resources to purchase and operate electric utilities.

Any municipality in South Carolina may join with other municipalities to perform its public functions. Article VIII, § 13 of the S. C. Constitution. Also any municipality, singly or together with other municipalities, may join with a political subdivision outside the State to perform public functions. Article VIII, § 13, *Id.*

Article VIII, § 16 authorizes a municipality, upon a majority vote of its electors to acquire and operate an electric system. It is conceded the ten municipalities who are members of PMPA presently own and operate electric systems and are providing electricity to their respective consumers. The electors of these ten municipalities have already made the basic decision to enter into the providing of electric services. The PMPA municipalities would therefore have the constitutional authority to join together directly with each other and with the

North Carolina joint agency in a project to provide electricity to their consumers. Act No. 473 of 1978 simply provides an alternative method to accomplish the same purpose through the formation of a joint agency. Section 6-23-110, Code of Laws, 1976, as amended.

PMPA, not the municipalities, will own the project with the North Carolina joint agency. The municipalities will purchase their electricity from PMPA under a contractual arrangement, in the same manner as they presently purchase their power from their suppliers. The project will not be part of the electric systems of the municipalities but will be solely owned and financed by PMPA through the issuance of revenue bonds.

The appellants assert that PMPA cannot acquire an electric generating station without an election. We disagree. PMPA is a political subdivision of the State of South Carolina created pursuant to legislative authority. See Act No. 473 of 1978. PMPA is a separate political subdivision from its member municipalities and is not subject to the election requirements of Article VIII, § 16. PMPA is more analogous to a special purpose district which need not hold an election prior to issuing bonds. *Rutledge v. Greater Greenville Sewer District, et al.*, 139 S. C. 188, 137 S. E. 597 (1927); see also *Lillard v. Melton, et al.*, 103 S. C. 10, 87 S. E. 421 (1915); *Park v. Greenwood County, et al.*, 174 S. C. 35, 176 S. E. 870 (1934); *Tovey v. City of Charleston*, 237 S. C. 475, 117 S. E. (2d) 872 (1961).

Even if the project were regarded as an extension of the electrical system of the municipalities, as suggested by the appellants, no election would be required. The electors in these municipalities have previously made the decision that their respective municipalities should own and operate electrical utility systems.

Once the initial decision has been made by the electors no further election to extend or improve the municipal electric system is required. The argument that a municipality is required to hold an election any time it enlarges a public utility system was rejected in *Seegers v. Gibbes*, 72 S. C. 532, 52

S. E. 586, 588 (1905). There the Court held that bonds issued to expand the City of Columbia Waterworks were valid without an additional election. Also see § 6-21-80, Code of Laws of S. C., 1976, which authorizes any municipality which owns and operates a public utility system to issue bonds to improve, enlarge, extend or repair it. This statute requires no election prior to the issuance of bonds for this purpose.

It is argued that the taxing power of the individual municipalities is pledged to secure the obligations of PMPA. We disagree.

The bonds issued to finance the project will be issued by PMPA and *not* the municipalities. The bonds will be payable from revenues derived by PMPA from the sale of electricity to the municipalities and others. This is the *only* source of revenue which is pledged to the payment of these bonds. *PMPA has no authority to assess and collect ad valorem taxes.* Hence, PMPA cannot use the taxing power to replace lost revenues which we held was improper in *Robinson v. White,* 256 S. C. 410, 182 S. E. (2d) 744 (1971). Section 6-23-110 states that the payments by the municipalities to PMPA shall be made from *revenues* derived from the operation of the municipal electric system and *shall not* invoke the municipalities' taxing power. The municipalities are only obligated to make payments from revenues derived from the rates and charges collected from the users of its electric system. Any attempt to equate these payments for electric utility services with taxes imposed on the citizenry in general is erroneous. It is conceded that the "bonds of PMPA are payable solely from the revenues collected by the municipality from their customers; neither the full faith and credit nor the taxing power of the state or any municipality is, or may be, pledged for payment of the bonds. Section 6-23-110."

This is sufficient to establish that the bonds are merely revenue bonds and are therefore no more than a special obligation of PMPA.

"This Court has constantly held that bonds issued by [municipalities]—which are payable out of special funds do not create debts—." *Clarke v. South Carolina Public Service*

*Authority, et al.,* 177 S. C. 427, 447, 181 S. E. 481, 489 (1935); *Elliott v. McNair, supra; Rutledge v. Greater Greenville Sewer District, supra.*

The only source of revenue pledged to the payment of the PMPA bonds is revenue from the product itself. There is no circumstance by which these bonds could be converted from special obligation to general obligation bonds. General obligation bonds are secured by the taxing power. Special obligation bonds are secured by the project revenues or some other special source.

The appellants also assert that the arrangement for the sale and operation of the project amounts, in substance, to joint ownership prohibited by Article X, § 11 of the S. C. Constitution. While the undertaking at hand involves a rather ingenious arrangement, we do not believe it constitutes joint ownership between a political subdivision and a private business. This project is admittedly a complex undertaking, but complexity alone does not condemn it under our Constitution. The joint ownership clause of Article X, § 11 simply states that neither the State nor any political subdivision may become a "joint owner of or stockholder in" a private company. Under the Project Agreement, PMPA will *not* become a "joint owner of" Duke. Duke will *not* become a "joint owner" of PMPA. PMPA will *not* become a "stockholder in" Duke. Duke will *not* become a "stockholder in" PMPA. PMPA has acquired neither stock nor any other form of ownership in a private company. This arrangement does not violate Article X, § 11 of the Constitution. PMPA will become a joint owner of the project with a joint agency organized under the laws of North Carolina. We hold this is proper under Article VIII, § 13 of our Constitution, which permits municipalities and other political subdivisions of South Carolina to join with, "any one or more governments whether within—or without this State," to perform public functions.

Appellants next argue that since there is specific authorization in Article X, § 11 for the South Carolina Public Service Authority to become a joint owner with privately owned electric utilities, that PMPA must acquire specific authorization by constitutional amendment.

The provision in Article X, § 11 authorizes joint ownership by an agency of the State of South Carolina *with* a privately owned corporation, thus permitting co-ownership of a single facility by a public and private entity.

Here PMPA will not be a co-owner of any property in common with Duke. Hence the amendment to Article X, § 11 does not apply to the facts of this action.

Appellants also contend the North Carolina joint agency was authorized by an amendment to the North Carolina Constitution to jointly own with private corporations. Unlike PMPA, the North Carolina joint agency has become a co-owner of the project with Duke. This factual difference makes the appellants' argument inapplicable to PMPA's situation.

Finally, this Court has never held a public entity's naked title to property operated by a private entity resulted in unconstitutional joint ownership. To so hold would overrule our prior decisions in *Elliott v. McNair, supra; Chapman v. Greenville Chamber of Commerce, et al.,* 127 S. C. 173, 120 S. E. 584 (1923) and *Gilbert v. Bath, et al.,* 267 S. C. 171, 227 S. E. (2d) 177 (1976). In each of these cases we approved as constitutional, projects in which the public entity held title but a private entity operated the project.

We hold this project complies with the Constitution in all respects and affirm.

Affirmed.

GREGORY and HARWELL, JJ., concur.

LEWIS, C. J., and LITTLEJOHN, J., dissent.

HARWELL, Justice (concurring):

I concur with the majority in holding that the Joint Municipal Electric Power and Energy Act of 1978 is constitutional, but by way of dicta, I feel I would be remiss in my responsibilities if I did not point out that there are many unanswered legal questions which could result in financial problems for the rate payers, bond purchasers and others involved in this matter. I would urge extreme caution by all.

LITTLEJOHN, Justice (dissenting):

I respectfully dissent and would reverse the Order of the Circuit Judge.

Plaintiffs Johnson and Jones are property owners, citizens, residents, and consumers of electricity in the cities of Newberry and Gaffney, respectively. The action is brought individually and on behalf of all persons similarly situated pursuant to the authorization of § 15-5-50, Code of Laws of South Carolina, 1976, as amended.

The defendants are PMPA, a joint collection of various municipalities as authorized under the Act, and the mayor and members of the city councils of Newberry and Gaffney. While Newberry and Gaffney are the only cities named as defendants, this action is brought against them as representatives of the governing bodies of all the municipalities forming PMPA (Abbeville, Clinton, Easley, Greer, Laurens, Rock Hill, Union, and Westminster). Reference to Newberry and Gaffney throughout this dissenting opinion applies equally to all the municipalities listed above.

The complaint alleges that the Act, the actions of the municipalities, and the contracts involved are in violation of the Constitution of this State. The complaint prays that the Act be declared unenforceable, that the defendants be enjoined from enforcing the Act, that PMPA be enjoined from issuing bonds, and that the contracts be declared illegal, void and unenforceable.

The people, speaking through a constitution, endeavor to protect their life, liberty and property by prescribing and limiting the powers of the government. This acts as a bulwark of liberty for the protection of private rights. The Constitution is the instrument of the people to protect themselves against the rule of man as contrasted with the rule of law.

The power of government to demand money from its people by way of taxation, or otherwise, is equivalent to the power to destroy. Realizing that there is great temptation on the part of those in public office to borrow money now for repayment by a future generation, such power is limited in most if

not all constitutions. The people speak to this in the Constitution of South Carolina. While many issues are raised by plaintiffs' exceptions, the basic point upon which our determination should hinge is:

MAY THE CITY COUNCILS OF NEWBERRY AND OF GAFFNEY PLEDGE THEIR USERS OF ELECTRICITY TO PAY AN UNSPECIFIED AND VIRTUALLY UNLIMITED AMOUNT OF MONEY BORROWED BY PMPA FOR THE PURPOSE OF BUYING A 25 PER CENT INTEREST IN A NUCLEAR GENERATOR FROM DUKE?

I submit that the action of the city councils and the contracts entered into by reason of the provisions of the Act are without legal authorization. In deciding whether the city councils of Newberry and of Gaffney may legally enter into the contracts they propose to carry out, thereby obligating their users of electricity to pay, we must consider the impact of that which they propose to do.

Duke's Catawba Nuclear Plant is now well under construction. Through its proposed sale, Duke hopes to ease its unprecedented financial costs for present and future construction necessary to meet increased demands and costs. The agreed statement of facts recites that the sale of the Catawba Plant was considered advantageous by Duke since it would reduce the company's need to raise outside capital to finance its construction program in the near future. For the project, PMPA agrees to pay Duke a downpayment at closing and monthly payments thereafter for materials, supplies and services necessary to complete the project and bring it into commercial operation. The total considerations to be paid by PMPA will equal 12.5 per cent of Duke's cost of completing the entire Catawba station plus additional profits and fees. It is an unlimited "cost-plus" job. Duke is hired as an independent contractor for the life of the unit. In summary, PMPA employs Duke to construct, operate and, at the end of its life, dismantle the nuclear project, and agrees to pay on a cost-plus basis. The cost is unspecified and unknown, but one fact is certain: PMPA must keep issuing bonds until enough money is borrowed to pay Duke. PMPA has no funds other

than borrowed money and, accordingly, must borrow at whatever interest rate the market demands.

Bonds involve the creation of debts for the purpose of raising money. A bond is not greatly unlike an individual's promissory note. A big difference lies in the fact that in the case of the promissory note, that individual is a party to the transaction and may elect to promise or not to promise. One who voluntarily signs a note effectively pledges his assets to the liquidation of the debt in case payment is not voluntarily made. In the case of a bond issue by a governmental entity, the person who must repay (normally taxpayers but here the consumers of electricity) has no personal say in the commitment. Those in governmental authority (here the city councils and PMPA) make the commitment for those who must repay the debt. In the case of a bond secured by a pledge of the taxing authority, a property owner must pay or be subjected to losing his property at a tax sale. Under the facts of the case before us, the city councils of Newberry and of Gaffney have undertaken to commit their users of electricity either to pay an unspecified debt plus a highly speculative interest or to give up electricity.

It is estimated that PMPA's purchase of the 25 per cent interest in the generator will necessitate the issuance of not less than 675 million dollars or more than 767 million dollars in bonds. According to an estimate of Robert E. Bathen, an engineering consultant, as shown by affidavit given in March of 1981, each week of delay after that time adds approximately 50,000 to 195,000 dollars to the total debt. There is no assurance that the cost will be so limited, for in this day of cost overrun and inflation, the cost might easily be twice as much. PMPA would be required, nevertheless, to issue bonds covering the total debt. For the purpose of our discussion, we will accept an estimated cost rounded off at 700 million dollars. This means that the electricity users in each of the ten towns involved must pay an average debt of 70 million dollars plus interest. During the life of a long-term bond, the *interest debt* rate alone, estimated at 9-11 per cent in the record, would create a debt amounting to several times the *principal debt*. Each town would pay during the first year an estimated 7 million dollars in interest alone to PMPA based on 10 per cent.

PMPA's debt must be paid from revenues assessed against the users of electricity in Newberry and Gaffney. Consumers must pay the rate dictated by PMPA (not by the city councils) or else withdraw from PMPA. In case of withdrawal, the municipality is subjected to the terms of § 6-23-70(c), which provides:

Any municipality may withdraw from the joint agency, *provided,* that all contractual rights acquired and contractual obligations incurred by a municipality while such municipality was a member shall remain in full force and effect.

In such event, the consumers of electricity would continue to pay though not participating any longer in the project.

I submit that the city councils have obligated their users of electricity to pay a debt which can probably never be liquidated, and that their action in making the commitment is without constitutional authority in at least four areas: (1) Election requirement, (2) Lending of credit, (3) Joint ownership, and (4) Classifications.

ELECTION REQUIREMENTS

The municipalities' decision to purchase an interest in an electric utilities system through a joint agency constitutionally belongs to its qualified electors, not to its governing body as permitted by the Act. This right to election is expressed in Article VIII, § 16, as follows:

Any incorporated municipality may, upon a majority vote of the electors of such political subdivision who shall vote on the question, acquire by initial construction or purchase and may operate gas, water, sewer, electric, transportation or other public utility systems and plants.

The record does not reflect the question upon which the various municipalities voted before coming to be involved in the generation, transmission and/or distribution of electric power. Certainly there is nothing in the record to indicate that any question contemplated that result which the Act and the contracts would bring about. Both the letter and the spirit of the constitutional provision mandates that the electors

in the respective municipalities be given an opportunity to voice their opinion on this enormous undertaking.

The joint agency is no more than an instrumentality of the municipalities. It is a sort of alter ego created for the purpose of doing indirectly that which the Constitution forbids municipalities to do directly. The Act itself in § 6-23-110 recognizes that:

. . . the creation of a joint agency is an alternative method whereby a municipality may obtain the benefits and assume the responsibilities of ownership in a project. . . .

I would hold that the governing body of the respective municipalities may not commit its users of electricity to the proposed project without first having submitted an appropriate question to the electors as contemplated by Article VIII, § 16.

## LENDING OF CREDIT

Under Article X, § 14, a political subdivision shall have the power to incur indebtedness in the following two categories, only:

(A) General obligation debt, and

(B) Indebtedness payable only from revenue-producing project or from a special source as provided in subsection (10) of this section.

The holder of a *general obligation* bond is legally entitled to require the political subdivision to levy property taxes against its property owners to assure satisfaction of the debt (i.e. *ad valorem* tax). Thus, he incurs no risk of repayment. The constitution expressly affords protection to property owners by restricting the issuance of general obligation debts by way of election requirements, maximum maturity date, etc. See Article X, § 14. Under no condition may a political subdivision pledge its credit for other than a public purpose.

The credit of neither the State nor any of its political subdivisions shall be pledged or loaned for the benefit of any individual, company, association, corporation or any religious or other private education institution. . . .

Article X, § 11.

*Special obligation* bonds, on the other hand, are defined in subsection (10) of Article X, § 14, as follows:

(10) Indebtedness payable solely from a revenue-producing project or from a special source, which source does not involve revenues from any tax or license, may be issued upon such terms and conditions as the General Assembly may prescribe by general law; . . . .

They are payable solely from a revenue-producing project or from a special source which does not involve any tax or license. The bondholder here incurs the risk that the revenue-producing project or special source will prove insufficient to satisfy the debt. Such bonds are not subject to the additional constitutional restrictions applicable to general obligation bonds.

The majority opinion would hold that the bonds to be issued by PMPA are special obligation bonds not subject to the same constitutional protections afforded general obligation bonds. That holding is based upon language in the Act that the payments by the municipalities to PMPA shall be made from revenues derived from operation of the municipal electric system (i.e., electricity bills) and shall not invoke the municipalities' taxing power. I cannot dispute this language being in the Act. For reasons discussed hereafter, however, I am of the opinion that the bonds herein should be subject to the same constitutional protection afforded the people where general obligation bonds are involved.

A thorough reading of the entire Act reveals that the municipalities are authorized to contractually incur debt on a "take or pay" basis:

. . . [The contract] may provide that the municipality so contracting shall be obligated to make the payments required by the contract *whether or not a project is completed, operable or operating* notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of a project or the power and energy contracted for, and that such payments under the contract shall not be subject to any

reduction, whether by offset or otherwise, and shall not be conditioned upon the performance or nonperformance of the joint agency or any other member of the joint agency under the contract or any other instrument.

§ 6-23-110. (Emphasis added).

In essence, the municipalities must pay for construction of the Catawba project whether or not the plant ever generates any electricity.

It is readily evident that should this nuclear project fail because of denial of governmental license, faulty construction, stricter government regulations, nuclear catastrophe, or otherwise, a municipality must increase its utility charges to its customers to meet its contractual obligation to PMPA so that PMPA can pay its 700 million dollar debt.

As mentioned above, PMPA would not be authorized to impose an *ad valorem* tax against property owners to repay the debt; thus, these bonds cannot be general obligation bonds in the usual sense.

However, these bonds do pledge the equivalent of the taxing power. The issuers of typical general obligation bonds say in effect to the bondholder, "We will tax the property owners if need be to repay the debt." Here, the issuer of the bonds (PMPA) effectively says, "We will assess the electric power users (i.e., ratepayers) if need be to repay the debt." I submit that both cases would usually involve basically the same people. There is little difference between pledging full faith and credit of the taxpayers and pledging the full faith and credit of electric users—each involves captive payors. The taxpayer must pay the tax or have his property sold; the ratepayer must pay the rate charge or either (1) discontinue the use of electricity, or (2) move out of town.

In *Robinson v. White*, 256 S. C. 410, 182 S. E. (2d) 744 (1971), we held that a bond issue which ostensibly involved repayment from a special source, only, but which in actuality caused the brunt of the payments to fall upon a large segment of the people, was effectually the obligation of the taxpayers generally. The same rationale applies here. The nuclear proj-

ect may or may not eventually generate revenue by producing nuclear energy to be used and paid for by the ratepayers. Whether or not such revenues are ever produced, the bondholders incur no risk since repayment is guaranteed by obligating the municipalities to increase the electricity rates in an amount sufficient to repay the bondholders.

Inasmuch as the Act and the contracts authorize the municipalities to collect money from its electric customers whether or not the project ever generates any electricity, thereby charging the customers for power never received, I think the bonds lose their identity as revenue-producing or special source bonds and must be treated as general obligation bonds.

I would hold that the authority to assess moneys for electric power not received is the equivalent of a tax, making all the rules, statutes, and constitutional provisions relating to general obligation bonds applicable here.

### JOINT OWNERSHIP

Does the relationship between Duke and PMPA constitute a joint ownership between public and private interests as prohibited under Article X, § 11, of our Constitution? That section reads in part as follows:

Article X, § 11. Credit of State and political subdivisions.

Neither the State nor any of its political subdivisions shall become a joint owner of or stockholder in any company, association or corporation. The General Assembly may, however, authorize the South Carolina Public Service Authority to become a joint owner with privately owned electric utilities, including electric cooperatives, of electric generation or transmission facilities, or both, and to enter into and carry out agreements with respect to such jointly owned facilities.

The Act itself provides the following:

❋　❋　❋

Nothing in this chapter shall be construed to authorize the issuance of the bonds for the purpose of financing facilities to be owned wholly or in part by any private corporation.

§ 6-23-320.

Not every joint endeavor or cooperative effort between a public entity and private business is constitutionally prohibited. See *Gilbert v. Bath,* 267 S. C. 171, 227 S. E. (2d) 177 (1976); *Chapman v. Greenville Chamber of Commerce,* 127 S. C. 173, 120 S. E. 584 (1923).

At times the State or one of its political subdivisions must tap the private sector's resources for needed services, e.g. planning, construction, maintenance. etc.. in connection with a State-owned and State-controlled project. Only where the connection and dependence between each other is such that the private entity possesses substantial ownership rights and characteristics in the project itself, so as to constitute for all practical purposes a union of ownership with the State, does an unconstitutional joint interest exist.

The undertaking at hand involves a rather ingenious arrangement between a political subdivision and private business. The many special features involved, the present and projected power needs and costs, and the sheer magnitude of the financing figures are factors which preclude a simplistic analysis of or answer to this issue. Having studied the arrangement in its entirety, I conclude that the constitutional attack is well-founded.

The Act, in § 6-23-90(*l*) permits PMPA:

(*l*) to acquire by negotiated purchase or lease an existing project, a project under construction, or other property, either individually or jointly, with one or more municipalities in this State or any other state owning electric distribution facilities or with any political subdivisions or agencies of any other state or with other joint agencies created pursuant to this chapter;

There can be no doubt but that this provision was designed to permit the sale by Duke of this particular property. This is true even though at some future date other similar sales might be brought about.

The project is already partially complete. Duke is given full authority over design, construction and operation of the

project as its plant; PMPA must pay 12½ per cent of Duke's costs for the entire Catawba station, including exploration and mining, whether or not the station ever produces nuclear energy; PMPA must purchase its interest in the nuclear generator on an "as is" basis, thereby waiving warranty rights; PMPA must waive certain potential legal claims against Duke; PMPA generally indemnifies Duke against third-party claims arising from Duke's construction and operation; North Carolina law controls in the event of any contractual dispute. Aside from naked title to a 25 per cent ownership interest, PMPA has acquired a bare minimum of rights commonly associated with full ownership. Conversely, Duke has divested itself of little more than legal title to this part interest. It will obviously continue to do those things it would do if no sale were undertaken. The agreements even provide that Duke ultimately decommission the project at the end of the project's useful life. The destiny of the project is in the hands of Duke, not PMPA or the ten municipalities. The sale is one in name only. The venture is inescapably one in which Duke retains most all benefits of ownership and avoids only the attending risks and liabilities. Duke's earnings would come by way of commission and fees instead of normal corporate profits.

If a joint interest of this type is desired, then there is cause to amend our Constitution. Article X, § 11, quoted above, has been recently amended to allow this type arrangement between the Public Service Authority and private business. I would further note that the North Carolina Constitution was so amended (see Article V, § 10) *prior* to the agreement between Duke and the North Carolina joint agency. Such an amendment must be affected by the people in the manner prescribed by the Constitution and not by the Legislature or by this Court.

The Act imposes the following contested restrictions and classifications:

(1) A municipality must have owned an electric power system for at least ten years. § 6-23-20(g).

(2) All municipalities must be located within the area generally served by the same electric supplier. § 6-23-30.

(3) The project must be acquired from the electric supplier generally serving the area in which the municipalities are located. § 6-23-30.

(4) The project acquired must be under construction on the date of the Act's approval or be constructed thereafter. § 6-23-30.

(5) The electric supplier must own and operate *nuclear* electric generating facilities. § 6-23-20(e).

Plaintiffs assert that these restrictions constitute arbitrary and unreasonable classifications in violation of the Equal Protection Clause of Article I, § 3, of our Constitution.

A legislative classification may not be arbitrary and must bear a reasonable relationship to a proper legislative purpose. *Dunn v. North Carolina National Bank,* S. C. 277 S. E. (2d) 143 (1981). I can recognize the logic behind restricting this joint effort to the municipalities and electric supplier within the same service area (restrictions [2] & [3]; however I do not readily find a rational basis for the remaining three restrictions (restrictions [1], [4], & [5]).

CONCLUSION

Several issues raised by the pleadings have been solved by the opinion of the majority; unfortunately, the Court is not presently faced with all of the legal issues potentially involved.

The Constitution, quoted hereinabove, provides that electors in a municipality may vote the municipally into, and authorize the operation of, an electric distribution system or plant. Though not specifically spelled out in the Constitution, it is inherent that the electors may also vote the municipality out of the electric distribution business at any time. Certainly, no municipality is locked in *ad infinitem.* Just what rights PMPA's bondholders would have, if any, in case some or all of the municipalities abandoned the electricity business is not a question now before the Court.

As indicated hereinabove, § 6-23-70(c) of the Act permits a municipality to withdraw from PMPA. What would

PMPA's bondholders' rights be, if any, if several or all of the municipalities withdrew?

An even more interesting legal question would be involved where a municipality both abandoned' PMPA and withdrew from the electricity distribution business. There is potentially involved both the due process and equal protection clauses of the State and Federal Constitutions.

Section 6-23-300 of the Act attempts to immunize directors of PMPA and officers of the municipalities, and persons acting in their behalf, from personal liability by reason of their actions incident to the contracts involved in this case. This, too, presents interesting questions. May a legislative act constitutionally deny an aggrieved person the right to recover from a wrongdoer.

Section 6-23-310 of the Act attempts to waive PMPA's immunity from suit ". . . of every kind and description, whether the same be in tort, contract, or otherwise. . ." arising out of development, ownership, and operation of the project. This means that PMPA may be sued. PMPA may satisfy judgments only by assessing the amount of the judgment against the consumers of electricity in Newberry, Gaffney, Abbeville, Clinton, Easley, Greer, Laurens, Rock Hill, Union, and Westminster. Procuring sufficient insurance to protect against nuclear catastrophe is impractical, if not impossible. Aggrieved persons, in case of a Three-Mile Island type of disaster, could look first to PMPA, which has no assets. PMPA could only pay by assessing the users of electricity in the ten cities.

The potential legal questions posed herein are by no means exhaustive, but are only intended to provide some matters for consideration by persons involved, directly or indirectly, with issuance of these bonds. Resolution of these potential issues, and others which may come to light, must await future litigation.

I would hold that the Act, the contracts, and the actions of the city councils are unconstitutional on each of the foregoing grounds and would reverse the Order of the trial court.

LEWIS, C. J., concurs.