22155

PALMETTO ALLIANCE, INC., Appellant, v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION and Piedmont Municipal Power Agency, Respondents.

(319 S. E. (2d) 695)

Supreme Court

*Edmund H. Robinson,* Charleston, *for appellant.*

*O. Wayne Corley* and *Robert T. Bockman,* of *McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble,* Columbia, *for respondent Piedmont Municipal Power Agency.*

*C. Dukes Scott,* Columbia, *for respondent Public Service Comm.*

Heard June 8, 1984.

Decided Aug. 13, 1984.

HARWELL, Justice:

The appellant Palmetto Alliance, Inc., initiated this action for judicial review of a South Carolina Public Service Commission (PSC) Order.

The respondent Piedmont Municipal Power Agency (PMPA) is an agency composed of ten municipalities which are authorized by the Joint Municipal Electric Power and Energy Act of 1978, S. C. Code Ann. §§ 6-23-60, *et seq.* (1983),[1] to purchase and operate electric power facilities. The PMPA applied with the PSC for authorization to purchase a 25% interest in Unit No. 2 of the Catawba Nuclear Station from Duke Power Company. The PSC found the purchase to be mutually beneficial to PMPA and Duke and approved the plan.

---

[1] The Act was held constitutional in *Johnson v. Piedmont Municipal Power Agency,* 277 S. C. 345, 287 S. E. (2d) 476 (1982).

The appellant intervened in the Commission proceedings and contends on appeal to this Court that the Commission's factual findings are insufficient and were made under unlawful procedure. Code § 1-23-380(g)(5) and (g)(3) (1983).

The circuit court judge properly analyzed the issues on appeal. We accordingly print the pertinent portions of his Order as the opinion of this Court.

"The scope of review in this matter is clear. This Court '. . . shall not substitute its judgment for that of the agency as to weight of the evidence on questions of fact.' S. C. Code Ann. § 1-23-380(g) (1976), as amended. Nor may the Court substitute its judgment for that of the Commission '. . .upon a question as to which there is room for a difference of intelligent opinion. . . .' *Chemical Leaman Tank Lines, Inc. v. S. C. Public Service Commission,* 258 S. C. 518, 189 S. E. (2d) 296, 298 (1972). The Commission's orders are presumptively correct. *South Carolina Electric and Gas Co. v. Public Service Commission,* 275 S. C. 487, 272 S. E. (2d) 793 (1980).·

In applying the well-accepted 'substantial evidence' standard for judicial review of administrative agency decisions, the South Carolina Supreme Court has stated:

"Substantial evidence" is not a mere scintilla of evidence nor evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached or must have reached in order to justify its action.

*Lark v. Bi-Lo, Inc.,* 276 S. C. 130, 276 S. E. (2d) 304, 306 (1981). Substantial evidence is something less than the weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Ellis v. Spartan Mills,* 276 S. C. 216, 277 S. E. (2d) 590 (1981). A judgment upon which reasonable men might differ 'will not be set aside.' *Lark v. Bi-Lo, Inc.,* 276 S. E. (2d) at 307.

The Commission clearly found the acquisition of the Project to be beneficial to PMPA. The record on review contains considerable evidence relative to the issue of benefit. Potential cost savings was the motivation for the

formation of PMPA and the decision to acquire the Project. Relative economics and cost savings were the subject of a major portion of the studies prepared by PMPA's consulting engineers, R. W. Beck and Associates, and the testimony in support of those studies. In large measure PMPA's rebuttal evidence was related to the question of the economic benefit to PMPA under changed assumptions suggested by Palmetto's witness.

With respect to the issue of benefit and the factors relating to the potential for benefit, the Commission reviewed the conflicting evidence offered by Palmetto and PMPA. The Commission's Order clearly demonstrates the evaluation of the respective evidence on load forecast, cost projections, estimated capacity factors, risk assessment and the ultimate issue of benefit. In each case, the Commission found PMPA's evidence to be more credible and reliable. For this Court to reach the opposite conclusion would require an exercise amounting to a determination of a matter "peculiarly within the Commission's province," *Greyhound Lines, Inc. v. South Carolina Public Service Commission,* 274 S. C. 161, 262 S. E. (2d) 18, 20 (1980), and would entail a substitution of judicial discretion for that of the Commission, a result which this Court is compelled to avoid. *Guerard v. Whitner,* 276 S. C. 521, 280 S. E. (2d) 539 (1981). The weighing of the evidence and the drawing of the ultimate conclusion therefrom is for the Commission, not for the Court on review. *So. Bell Tel. & Tel. Co. v. Public Service Commission,* 270 S. C. 590, 244 S. E. (2d) 278 (1978). The Commission's findings cannot be overturned "... unless there is no reasonable probability that the facts could be as related by [PMPA's] witness upon whose testimony the finding is based." *Lark v. Bi-Lo, Inc.,* 276 S. E. (2d) at 307.

Based on the record before this Court, the Commission's decision cannot be said to be "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." The evidence is sufficient to "... allow reasonable minds to reach the conclusion which the administrative agency reached or must have reached in order to justify its action." *Lark v. Bi-Lo, Inc.,* 276 S. E. (2d) at 306. *Laws v. Richland County School Dist. No. 1,* 270 S. C. 492, 243 S. E. (2d) 192 (1978).

Palmetto further asserts that the Commission failed to adequately consider the six statutory factors identified by S. C. Code Ann. § 6-23-60 (1976), as amended. That assertion is not supported by a review of the Commission's orders. The six factors which the Commission must consider are:

(i) The economies and efficiencies to be achieved in constructing on a large scale, facilities for the generation and transmission of electric power and energy;

(ii) The municipalities' needs for reserve and peaking capacity and to meet obligations under pooling and reserve-sharing agreements reasonably related to its needs for power and energy to which it is or may become a party;

(iii) The estimated useful life of such project;

(iv) The estimated time necessary for the planning, development, acquisition or construction of such project and the length of time required in advance to obtain, acquire or construct additional power supplies;

(v) The reliability and availability of existing or alternative power supply sources and the costs of such existing or alternative power supply sources; and

(vi) The load forecast of capacity of a project and the utilization of such capacity by the joint agency for a reasonable period of time subsequent to the date of commercial operation of the project.

In the hearing in November, PMPA's witness Holmes testified specifically that each of these six issues had been taken into consideration in Beck's Preliminary Engineering Report and in all subsequent analyses performed by the consulting engineers. The Commission's Order referred particularly to certain conclusions in that Report which reflected each of the statutory considerations.

The Commission's Order is explicit with demonstrations of the Commission's consideration of the six statutory issues. The issues identified by Palmetto and the evidence of both parties were specifically referenced to one or more of the required considerations. The consideration of project economies and efficiencies was addressed in the discussion of the cost elements: operation and maintenance cost projections, capital cost projections, capacity factor estimates, and capital

additions. The second consideration, need for power and energy, was the subject of the Commission's discussion of load forecast. The consideration of the Project's useful life, previously made in a Commission Order, was reaffirmed in the subsequent order since Palmetto's evidence did not challenge such consideration. The estimated time for completion of the Project, also previously determined and unchallenged by Palmetto's evidence, and the economics of that issue were likewise considered. The consideration of alternatives and relative costs was made in the order's discussion of operation and maintenance costs, capital costs, capacity factor estimates, and risk assessment. Finally, the consideration of load forecast was a specific object of the Commission's order.

The Commission's consideration of the required statutory matters and the Commission's ultimate finding of benefit to PMPA are clear and express. Those determinations are specific, definite and sufficient to enable this Court on review to comprehend what the Commission did and why it was done. *United Tel. Co. of Carolinas v. S. C. Pub. Service Comm'n*, 264 S. C. 212, 213 S. E. (2d) 738, 739 (1975); *State Board of Medical Examiners v. Gandy*, 248 S. C. 300, 149 S. E. (2d) 644, 645 (1966).

## THE COMMISSION'S PROCEDURES

Palmetto argues that the Commission's procedures have unlawfully deprived it of due process of law. Any party in an administrative agency proceeding is entitled to certain procedural opportunities of notice and a fair hearing. *See Morgan v. United States*, 304 U. S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). This Court finds that the Commission's procedures and the conduct of the hearing below fully satisfied the requirements of due process. Furthermore, proof of a denial of due process in an administrative proceeding requires a showing of substantial prejudice. *Ka Fung Chan v. I.N.S.*, 634 F. (2d) 248 (5th Cir., 1981). Palmetto has demonstrated no substantial prejudice resulting from any action by the Commission. No action of the Commission deprived Palmetto of procedural due process.

Palmetto argues that the consideration of evidence taken after a remand for additional testimony was a "mere sham" in that the Commission's procedures deprived Palmetto of ade-

quate discovery and of a fair opportunity to be heard. Palmetto's claims relate principally to three particular issues: the conduct of prehearing discovery, the presentation of PMPA's rebuttal evidence and Palmetto's failure to present surrebuttal evidence.

The Order remanding the matter provided that additional evidence should be heard by the Commission "after sufficient opportunity for the conduct of discovery against PMPA and Duke ..., as provided for by the Commission's Rules of Practice and Procedure." It is well-settled that "the scope and conduct of discovery are within the sound discretion of the trial court ..., and that after final judgment of the district court or final agency order, [the Court's] review is confined to determining if that discretion has been abused ...." *Marroquin-Manriquez v. I.N.S.*, 699 F. (2d) 129 (3rd Cir., 1983). Based upon the record herein, this Court finds no abuse of the Commission's discretion in the conduct of prehearing discovery.

The Commission's rules on discovery provide for written interrogatories and oral depositions. Pursuant to those rules, Palmetto served PMPA and Duke with more than fifty interrogatories and requests for production of documents. In response to the discovery requests, PMPA and Duke provided some substantive information and further explained that much of the requested material was voluminous and its reproduction and delivery would be unreasonably burdensome. PMPA responded that such material was available for inspection at the offices of its consulting engineers, R. W. Beck and Associates, in Orlando, Florida.

Palmetto then moved the Commission to compel PMPA and Duke to respond further to the discovery requests. Both PMPA and Duke filed responses to Palmetto's motion by which the original responses were supplemented by additional information. PMPA's response included an affidavit describing PMPA's offer to incur the transportation and incidental expenses for Palmetto's counsel and expert witness to inspect the records in the possession of PMPA's consulting engineers and to make available without cost knowledgeable personnel to assist in the identification and explanation of the documents and to be deposed without cost if deemed necessary by Palmetto. Palmetto would not accept this offer in the

absence of an agreement that PMPA would also reimburse Palmetto for the value of the time of its expert witness. PMPA declined to pay the expert's hourly charge.

After review of the issues on discovery appearing in Palmetto's motion to compel and in PMPA's and Duke's responses, the Commission issued an Order on June 8, 1983, in which it found the discovery responses, including PMPA's offer, to have been 'full and sufficient,' and denied the motion to compel.

This court agrees with the Commission that Palmetto had reasonable access to the requested materials either through actual production or through the availability of such materials at PMPA's expense. Where documentary materials sought to be discovered are extremely voluminous as here and where their production and delivery would prove extremely burdensome, it is not unreasonable or unfair to provide for availability and inspection as PMPA here offered. *Petruska v. Johns-Manville*, 83 F.R.D. 32 (E. D. Pa. 1979); *Mid-American Facilities, Inc. v. Argonaut Ins. Co.*, 78 F.R.D. 497 (D. C. Wisc. 1978). The Commission's finding that PMPA and Duke had reasonably complied with the requirements under its discovery rules does not amount to an abuse of discretion.

Palmetto has not demonstrated that the actions of PMPA or the Commission during discovery impaired Palmetto's ability to prepare and present its evidence to the Commission. The Record shows that the systematic independent studies performed by Palmetto's expert witness, Dr. Richard A. Rosen, did not require the availability of information identified in the discovery requests. Dr. Rosen already maintained all the necessary information to produce his studies of operation and maintenance cost projections, capital cost projections and estimated capacity factors. In discovery, Palmetto did not seek production of information necessary to perform a load forecast of the type recommended by Dr. Rosen.

The information for Dr. Rosen's analysis or projected capital additions was already secured from the United States Department of Energy and was not requested in discovery.

Palmetto asserts that it was unable to test to its satisfaction the results of PMPA's assumptions and studies. However, the information which Palmetto claimed it needed for such purpose was either provided in discovery or was made

available for Palmetto's inspection at Beck's offices. That material in sufficient detail to replicate Beck's studies could have been reviewed had Palmetto taken advantage of the available opportunity to inspect PMPA's materials. For example, the record demonstrates that the inspection would have enabled Palmetto to replicate the results of Beck's load forecasts. Any prejudice which may have occurred to Palmetto was the consequence of its own actions, and is not the result of action by the Commission. There was no abuse of that agency's discretion in the conduct of discovery.

Palmetto likewise maintains that the Commission improperly allowed PMPA to offer rebuttal evidence to the testimony of Palmetto's witness. Palmetto's assertion is founded upon its claim that such rebuttal evidence was not specifically authorized by the circuit court order and that Palmetto was unprepared to cross-examine this rebuttal evidence.

The Order was silent with respect to the presentation of rebuttal evidence. It is clear, however, that PMPA as the party with the burden of proof in a trial, had a right to offer rebuttal evidence. *Daniel v. Tower Trucking Co.*, 205 S. C. 333, 32 S. E. (2d) 5 (1944). The Commission properly limited the rebuttal evidence strictly to a reply to Palmetto's evidence, and the Commission's Order demonstrates clearly that PMPA's rebuttal evidence was related only to the specific issues raised by Dr. Rosen. The presentation of PMPA's rebuttal evidence does not constitute an abuse of the Commission's discretion.

The limited nature of the rebuttal evidence does not substantiate Palmetto's claim that it was without an adequate opportunity to contest such evidence. The issues addressed in rebuttal were the identical issues identified and pursued by Palmetto's own witness. The record illustrates that the exhibits presented during the course of the rebuttal testimony were made available to Palmetto 'as soon as practicable' in accordance with the Commission's rules and regulations. S. C. Code Ann., R. 103-869(C) (1976), as amended. Further, those exhibits were the product of methods which had been previously used by Beck and which were not only familiar to Palmetto and its expert witness but were characterized as reasonable by Dr. Rosen. Further, the rebuttal documents were similar to

materials submitted to Palmetto in response to discovery requests. This Court finds no unfairness associated with the Commission's acceptance of the rebuttal evidence or with the procedure and conduct of cross-examination.

Finally, Palmetto argues that the Commission failed to provide Palmetto the opportunity to respond to PMPA's rebuttal evidence. The opportunity to present surrebuttal evidence is discretionary with the Commission. This Court finds no element of unfair surprise in the limited scope and presentation of the rebuttal evidence offered by PMPA. Furthermore, the Commission here actually provided Palmetto the opportunity to offer surrebuttal evidence. However, because Palmetto had elected not to keep Dr. Rosen available for the balance of the Commission's hearing, Palmetto failed to present such evidence when allowed the opportunity by the Commission. The Commission further permitted Palmetto the opportunity to contest the validity of PMPA's rebuttal evidence by way of a brief or proposed findings and conclusions. Palmetto did submit a proposed decision for the Commission's review, and in that document actually did attack the probity and substance of PMPA's rebuttal evidence. There is no clear abuse of the Commission's discretion in that procedure."

The appellant also asserts that the procedure is unlawful in that the Commission denied his motions for production of notes used by witnesses Priory and Lawton in their rebuttal testimony. This exception is not properly before this Court. Questions not presented in the lower court are not to be considered for the first time on appeal. *Elliott v. Page*, 98 S. C. 400, 82 S. E. 620 (1914). Even if the appellant's objection at the Commission level was sufficient to preserve the matter for this Court's review, we find no reversible error. The appellant has shown no prejudice.

The judgment below is, accordingly,

Affirmed.

NESS, GREGORY and CHANDLER, JJ., concur.

LITTLEJOHN, Chief Justice, dissenting:

I respectfully dissent.

I adhere to my views expressed in my dissent concurred by

Chief Justice Lewis, now retired, in *Johnson v. Piedmont Municipal Power Agency,* 277 S. C. 345, 287 S. E. (2d) 476 (1982). Reference is made to the report of that case for a more full understanding of the constitutionality of the Joint Municipal Electric Power and Energy Act of 1978, *South Carolina Code Ann.* §§ 6-23-10 to -330 (1983) (the Act), and of the new issues now presented to the Court with which we must deal.

The Act requires that a contract such as that proposed between PMPA and Duke be approved by the Public Service Commission of South Carolina. The basic issue with which the Commission was confronted was: Is the proposed sale and purchase contract mutually beneficial to PMPA and Duke. The Commission answered: Yes. The approval was appealed to the Circuit Court which affirmed the Commission's action. The same issue is now submitted to this Court as a result of the appeal of Palmetto Alliance, Inc., a consumer oriented public organization which has intervened.

I have no difficulty in concurring with that part of the Commission's finding that the contract is beneficial to Duke. Patent is the fact that the entire transaction has been orchestrated and finely tuned by the Duke Power Company. The agreed statement of fact in *Johnson,* in which Duke was a party, recites: ". . . That the sale of the Catawba Plant was considered advantageous by Duke since it would reduce the Company's need to raise outside capital to finish its construction program in the future." It absolves Duke of all liability and assures it of a cost plus construction and operational profit. It cannot lose. On the other hand, in my view, the ten towns and the ratepayers cannot win. The remote possibility of winning is certainly not worth the gamble involved.

The circuit judge's order and the majority opinion, which in large measure quotes that order, disposes of the case by holding that the Commission had before it substantial evidence which is all that is required under the Administrative Procedures Act, *South Carolina Code Ann.* § 1-23-380(g) (1983).

Section 6-23-60 of the Act sets forth six factors which should be considered in determining whether the contract is beneficial to both PMPA and Duke. I think there is merit in the second question raised by Palmetto Alliance, Inc.:

Did the trial judge err in affirming Commission Orders 82-815 and 83-475 in that they failed to make concise and explicit findings of fact on the economies and efficiencies to be achieved in constructing on a large scale, facilities for generating electric power and on the reliability, availability and costs of existing or alternative sources of power supply?

It is common knowledge that commercial nuclear power, once hailed as the cheapest, cleanest, and most efficient escape from the rising spiral of energy costs, has floundered on the rocks of a more restrictive regulatory climate, environmental and safety concerns, diminished growth in consumer demand, and rapidly escalating capital cost. Equally well known is the fact that almost one hundred nuclear plants have been commenced and abandoned after billions of dollars were invested. In each instance, the builders have concluded that money could be saved by abandoning the projects as contrasted with attempting to complete them. Duke completely understands, if PMPA does not, the advantage of abandoning such projects. In November 1982, Duke announced cancellation of Cherokee Units No. 2 and No. 3; in April 1983, it discontinued the construction of Cherokee Unit No. 1. Obviously, so long as PMPA can sell bonds to pay Duke, Catawba No. 2 will not be cancelled. In these instances, the tremendous loss must be absorbed by either the stockholders or consumers. If, in the last analysis, this project should be abandoned, the loss must be absorbed by the ratepayers of Rock Hill, Gaffney, Easley, Greer, Westminster, Abbeville, Clinton, Laurens, Newberry, and Union. This is true because PMPA has no assets other than its ability to "tax" the consumers in these towns. There are no stockholders in the usual sense of the word and Duke, under this contract, is absolved of any liability. Presumably, if the contract is cancelled, it could collect its fees and PMPA would assess them against the consumers of the towns.

Also a matter of common knowledge is the fact that no new nuclear plants have been commenced in several years and none are now contemplated. It is difficult to understand how the Commission could find that the type of project no power company would commence today could be profitably bought.

This is particularly true when patently no one can estimate with reasonable accuracy the total cost of the project and the price which PMPA will have to pay and pass on to the consumers. Truly PMPA is buying a pig in a poke. When this case was before us approximately two years ago, Beck (the consultant), Duke, and PMPA represented to the Court that there was involved between $675,000,000 and 767,000,000 in bond issues. In my dissenting opinion, I commented: "There is no assurance that the cost will be limited, and in this day of cost overrun and inflation, the cost might easily be twice as much." It now develops that the best estimate of Beck, Duke, and PMPA is some $1,200,000,000—which is almost twice as much. While total cost is unfathomable, it is certain that PMPA and its North Carolina counterpart, which buys a seventy-five percent interest in the project, must continue to borrow money by way of bond issues until sufficient funds are borrowed to pay the total cost. Assuming that bonds will sell, it is inescapable that this high risk project would involve high interest bonds. This factor alone makes the ultimate cost (principal and interest) completely unpredictable.

It should be pointed out that the testimony of Beck, the consulting engineer, was based, not on facts known to him, but on figures and information supplied by Duke. Beck and Associates are the same engineers who provided services to Washington Public Supply Systems which has resulted in the greatest bond default catastrophe in the history of the United States. The scheme of operation there and here is greatly similar.

It can be argued with some force that, if this is a bad contract, it is of no concern to the Court so long as it is legal. Even accepting this premise, the case should at least be remanded to the Commission for failure to make concise and explicit findings of fact on the economy and efficiencies to be achieved. The Commission appears to proceed on the theory that these towns have no better alternative than to agree to the Duke contract. The Commission does little more than recite that it has given consideration to the six factors enumerated in the Act. Nothing in the Act suggests that the Commission should limit its vision to nuclear plants, and nothing in the record indicates that nuclear is the most economical and efficient way to serve the power needs of PMPA's

members. The bulk of the applicant's case is bottomed on the Beck study which is basically a comparison between two alternatives: (1) remaining wholesale customers of Duke; and (2) entering into the various agreements and contracts to purchase one-fourth of the Catawba Unit No. 2. The analysis conducted by Beck, and accepted by the Commission, simply (1) asserts that Catawba No. 2 and the other plants tied with it under the project agreement are the answer to the power needs of the PMPA members; and (2) focuses on why ownership is better than being a wholesale customer.

When and if bonds are issued by PMPA, purchasers of the bonds may acquire certain constitutional protections growing out of the contract. At that point, PMPA and the ten towns and, in turn, the consumers may be locked into problems from which they cannot extricate themselves. The contract obligates PMPA, the towns, and the consumers to pay for the project even if abandoned and even if no benefits are ever received. Before PMPA should be permitted to impose an obligation upon the consumers, all other alternatives should be pursued and excluded. I submit that it is no longer feasible to commence a nuclear generating plant, it is no longer feasible to buy a twenty-five percent interest in one.

In oral argument, counsel takes position that all of the legal issues, including those enumerated in my dissenting opinion in *Johnson*, have been settled. I disagree.