THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Robert Calvin Vaughn, by Faye Vaughn, Respondent,
 
 
 

v.

 
 
 
 Salem Carriers, Employer and Virginia Surety Company, Carrier, Appellants.
 
 
 
 
 

Appeal From Greenville County
Edward W. Miller, Circuit Court Judge

Unpublished Opinion No. 2005-UP-603
Submitted November 1, 2005  Filed November 30, 2005

AFFIRMED

 
 
 
 Kay G. Crowe and Andrea C. Pope, of Columbia, for Appellants.
 Joseph Collins Smithdeal, of Greenwood, for Respondent.
 
 
 

PER CURIAM:  In this workers compensation action, Salem Carriers and Virginia Surety Carrier appeal the trial courts order affirming the order of the South Carolina Workers Compensation Commission (Commission), which awarded benefits to Faye Vaughn for the death of her husband, Robert Vaughn.  We affirm.1
FACTUAL/PROCEDURAL BACKGROUND
Salem Carriers employed Robert primarily as a drop and hook driver from December 1996 until his death on July 7, 1999.  As a drop and hook driver, Robert transported box trailers filled with textiles from the Sara Lee plant in Hodges, South Carolina to another plant location, dropped off the trailer, picked up a trailer, and then returned to the plant in Hodges.  A drop and hook operation is considered light duty work for a truck driver.  
During the week of July 1 through 7 of 1999, the Sara Lee plants were shut down and Robert was not scheduled to drive.  Robert agreed, however, to substitute as a flatbed truck driver for Salem Carriers RMAX account.  Driving a flatbed truck typically requires more physical activity than a drop and hook operation of dropping off and hooking up to loads.  Flatbed driving often involves securing the load, requiring tarping, climbing, and strapping by the driver.  The strapping and tarping occurs after the truck has been loaded, and the loading usually takes fifteen to twenty minutes for a load the size of the one Robert was driving.  One of the drivers who Robert substituted for at the time of his death, Eugene Miller, testified about the normal process for securing a load.  Miller testified that at the RMAX plant, if he was present he would observe the product being loaded, but sometimes it was loaded without him being there.  In securing the load, a driver first has to throw six or seven straps over the load.  He then has to climb up a thirteen-foot ladder, which is like an airplane ladder, onto the top of the load and get on his hands and knees in order to straighten the straps.  He would stand up to go to the next strap and then get down on his hands and knees again.  He would also put corner pieces on to keep the load from being damaged.  He then climbs back down the ladder and hooks the straps and tightens them with a metal bar.  Finally, the driver would usually put a tarp weighing twenty to thirty pounds, over the load, climb back up the ladder, and then spread the tarp over the load. He would then secure the tarp by hooking thirty or forty bungee cords onto the tarp, tighten the cords, and then hook them to the side of the trailer.  The strapping and tarping normally takes from thirty minutes to an hour and fifteen minutes, depending on the driver.  
While working for Salem Carriers, Robert drove a flatbed truck only three days in 1998 and for two days in July 1999 before the day of his death.  It is undisputed Robert was a drop and hook driver, as opposed to a flatbed driver, ninety-eight to ninety-nine percent of the time he was employed with Salem Carriers.  When Robert came home after his first day as a substitute driver during the first week of July, 1999, his wife testified that he was dragging, gray, ashy, and sweating.  After he worked July 1 and 2, he was off for a long weekend.  Over that weekend he did a little painting and wallpapering, and cut the grass with a riding mower, but did not perform any strenuous activities.  According to Fayes testimony, on July 6, Robert arrived home early and appeared normal.  Roberts log sheet indicated he was present at the RMAX plant from ten in the morning until noon that day.  The log sheet does not specify what he was doing at the plant for that time and the parties dispute whether the truck was loaded and Robert secured it on that date or whether the truck may have just been loaded then.  
The record shows on July 7, Robert was at the RMAX plant for approximately one hour and twenty-three minutes before he left the plant with his secured load.  At 9:08 a.m., after driving from the RMAX plant in Greer into downtown Greenville, Vaughn called for an ambulance.  Once it arrived, he told the emergency medical technician that he began having chest pains while he was securing his load around 8:00 that morning.  Robert was taken to the emergency room and died that same day from cardiac arrest.  
Miller testified it was not unusual on this route for a truck to be loaded and left overnight without it having been strapped or tarped by the driver.  He further stated, based on his experience, he believed Robert did not take possession and control of the load until July 7, when he signed the bill of lading, and that he was of the opinion Robert spent the morning of July 7 at the RMAX plant securing his load.  Miller also opined that for the two hours Robert was at RMAX on July 6, he was waiting to get his truck loaded.  David Doherty, who was presented as an expert witness in the field of trucking operations, testified that during the two hours Robert was at the plant on July 6, he could have been repositioning his trailer, performing an inspection on his trailer, or waiting for it to be loaded but encountered a problem and the loading was not completed.  He stated that trailers like this could be loaded in the drivers absence.  Doherty was of the opinion Robert was hooking up his trailer and strapping and tarping his load on the morning of his death.  
Roberts personal physician, Internist Dr. Russell Hall, testified, although Robert had previously undergone some cardiac testing in 1998, he was considered at low risk for a cardiac event at that time.  Further, while Robert had a history of transient ischemic attack, or a stroke that resolved itself, dating back to 1991, this condition was the result of a mitral valve prolapse which had nothing to do with his heart attack.  After review of Roberts hospital records from the day of his death, he agreed Robert had severe coronary artery disease.  Dr. Hall stated that if Robert did not usually secure a load as part of his usual job, and if he secured a load on the morning of July 7, he was of the opinion that the securing of the load provoked his heart attack.  It was his opinion that the exertion involved, which was above and beyond what he was accustomed to doing in the course of his job, had a role in precipitating the heart attack.  
Faye initiated a workers compensation claim.  Salem Carriers denied the claim asserting Roberts death was not causally related to the work he performed and there was no unusual stress or strain involving the work that caused Roberts heart attack.  The Single Commissioner denied Fayes claim, finding the evidence showed Robert secured the trucks load the day before the heart attack, and therefore Robert did not experience any unusual stress or strain on the day of his death.  Faye appealed to the Full Commission, which reversed the decision of the Single Commissioner, finding the evidence showed Robert secured his load on the day of his death and that he was involved in strenuous physical exertion that was an unusual and extraordinary condition of his employment on that day.  The Commission further found medical evidence supported a finding that the unusual and extraordinary exertion caused Roberts heart attack by aggravating a preexisting heart condition.  The circuit court affirmed, finding substantial evidence of record supported the Commissions order.  This appeal followed.
STANDARD OF REVIEW
The Administrative Procedures Act establishes the standard of review for decisions by the South Carolina Workers Compensation Commission.  Lark v. Bi-Lo, Inc., 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981).  In workers compensation cases, the Full Commission is the ultimate fact finder.  Shealy v. Aiken County, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000).  The final determination of witness credibility and the weight to be accorded evidence is specifically reserved to the Full Commission.  Id.  
An appellate court may reverse or modify the Commissions decision if substantial rights of the appellant have been prejudiced because the findings or conclusions of the commission are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record.  S.C. Code Ann. § 1-23-380(A)(6) (2005).  Substantial evidence is not a mere scintilla of evidence nor evidence viewed blindly from one side, but is evidence which, when considering the record as a whole, would allow reasonable minds to reach the conclusion that the agency reached.  Palmetto Alliance, Inc. v. South Carolina Pub. Serv. Commn, 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984).  The possibility of drawing two inconsistent conclusions from the evidence does not preclude the agencys finding from being supported by substantial evidence. Id.
LAW/ANALYSIS
I.   Findings of Fact
Salem Carriers argues the circuit court erred when it found substantial evidence supported the Full Commissions findings that (1) the truck was loaded on the day of Roberts heart attack; (2) securing the load was an unusual or extraordinary condition of employment; and (3) unusual and extraordinary conditions of employment caused Roberts heart attack.  We disagree.
A.   Loading the Truck
Salem Carriers argues the finding that the truck was loaded on the day of Roberts heart attack is unsupported by substantial evidence and that Faye failed to prove Robert secured his load on that day.  Accordingly, it contends there is no temporal connection between any exertion and the heart attack.  We disagree.
First, it should be noted there was no finding that the truck was loaded on the day of Roberts heart attack.  Rather, the Commission found Robert was securing his load on July 7 when he began experiencing chest pains.  Neither the Full Commission nor the circuit court made a finding regarding which day the truck was loaded.  The question to be determined is not when the truck was loaded, but when Robert secured that load, which required the physical exertion by Robert.  
Miller testified it would not be unusual for a truck to be loaded and left overnight without it having been secured by the driver, and Doherty indicated trailers were at times loaded in the drivers absence.  Based on his experience, Miller believed Robert did not take possession and control of the load until July 7, when he signed the bill of lading, and that Robert spent the morning of July 7 at the RMAX plant securing his load. It was Dohertys expert opinion that Robert was hooking up his trailer and strapping and tarping his load on the morning of his death.  Further, there was evidence that Robert told an emergency medical technician on July 7 that his chest pains began as he was securing his load around 8:00 that morning.  Finally, there is evidence Robert had been at the plant for one hour and twenty-three minutes before he left the plant with his secured load on July 7, giving him enough time to secure the load that morning.  Accordingly, substantial evidence supports the Commissions finding that Robert secured his load on the day of his death.
B.   Unusual or Extraordinary Conditions   
Salem Carriers also argues substantial evidence does not support the Commissions finding that securing the load was an unusual or extraordinary condition of Roberts employment resulting in his heart attack.  We disagree.

 If an employee dies of a heart attack . . . he or she must show not only that the injury was in the course of employment but also that the death arose out of employment, in that it was brought about by unexpected strain or over-exertion, or as a result of unusual and extraordinary conditions of employment  However, if such an injury results as a consequence of the ordinary exertion that is required in the performance of employment duties in the ordinary and usual manner, and without any outward untoward event, it is not compensable as an accident.

Jennings v. Chambers Dev. Co., 335 S.C. 249, 255, 516 S.E.2d 453, 456 (Ct. App. 1999) (citations omitted).  Salem Carriers bases its appeal on the fact that securing a load is usual and ordinary for a flatbed truck driver.  While this is true, Robert was employed primarily in the light duty position of a drop and hook driver and rarely drove a flatbed truck for the company.  He was a drop and hook driver ninety-eight to ninety-nine percent of the time he was employed with Salem Carriers, having driven a flatbed truck only three days in 1998 and two days in July 1999 before the day of his death.  Thus, substantial evidence supports the Commissions finding that securing the load for the flatbed operation was an unusual and extraordinary condition of Roberts employment duties.
C.   Causation
Next, Salem Carriers argues there was no substantial evidence of record to support a finding that Roberts heart attack was caused by unusual and extraordinary conditions of employment.  We disagree.  
In order for a death from a heart attack to be compensable, it must arise out of employment, in that it is brought about by unexpected strain or over-exertion, or as a result of unusual and extraordinary conditions of employment.  Jennings, 335 S.C at 255, 516 S.E.2d at 456.  Here, Dr. Hall testified that if Robert did not usually secure a load as part of his usual job, and if he secured a load on the morning of July 7, he was of the opinion that the securing of the load provoked Roberts heart attack.  It was Dr. Halls opinion that the exertion above and beyond what Robert was accustomed to doing in the course of his job had a role in precipitating his heart attack.  Further, the doctor who treated Robert at the hospital the morning he had the heart attack, Dr. Cebe, testified, in order to correlate a heart attack with extreme exertion, there must be a temporal relationship between the exertion and the onset of symptoms.  Dr. Cebe further stated unusual physical exertion can trigger a heart attack, and he was of the opinion, assuming the level of physical exertion described and based on what he had seen in Roberts medical records, that Roberts heart attack was related to the physical exertion he experienced at 8:00 on the morning of his death.  
We hold substantial evidence supports the Commissions finding that Robert was involved in strenuous physical exertion that was an unusual and extraordinary condition of his employment and that the unusual and extraordinary exertion caused Roberts heart attack by aggravating a preexisting heart condition.
II.   Error of Law
Finally, Salem Carriers argues Faye did not meet her burden of proof, and therefore, the award of benefits was an error of law.  It argues whatever Robert was doing on the morning of his death was sheer speculation, and therefore the claim must fail.  We disagree.
The Full Commission found that (1) Robert was securing his load on July 7 when he began having chest pain; (2) as a substitute flatbed truck driver, Robert was engaged in strenuous physical exertion that was an unusual and extraordinary condition of employment for Robert; and (3) medical evidence supported a finding that the unusual and extraordinary physical exertion caused the heart attack by aggravating a pre-existing heart condition.  As previously noted, substantial evidence supports the Commissions finding that Robert secured his load on the morning of his death, and that securing the load for the flatbed operation was an unusual and extraordinary condition of Roberts employment duties.  The record also contains substantial evidence that the unusual and extraordinary exertion caused Roberts heart attack by aggravating a preexisting heart condition.  Accordingly, Faye met the burden of proof required for a heart attack to be compensable. 
CONCLUSION
Based on the forgoing, we find the Commissions findings of fact were supported by substantial evidence and that Faye met her burden of proving her husbands heart attack was compensable.  Accordingly, the order of the circuit court affirming the award of benefits is 
AFFIRMED.
HEARN, C.J., AND HUFF AND BEATTY, JJ., concur.

1 We decide this case without oral argument pursuant to Rule 215, SCACR.