712 S.E.2d 428

Jerry H. RISHER, Respondent,

v.

The SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Office of Ocean and Coastal Resource Management, Appellant,

State of South Carolina and South Carolina Coastal Conservation League, Intervenors,

Of whom, South Carolina Coastal Conservation League is, Appellant.

No. 26990.

Supreme Court of South Carolina.

Heard May 25, 2010.

Decided June 20, 2011.

Rehearing Denied July 21, 2011.

200

Amy E. Armstrong and James S. Chandler, Jr., of S.C. Environmental Law Project, of Pawleys Island, for Appellant South Carolina Coastal Conservation League, Davis Whitfield–Cargile, SC Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management, of Charleston, for Appellant South Carolina Department of Health and Environmental Control.

Mary D. Shahid, of Nexsen Pruet, and R. Cody Lenhardt, Jr., of McNair Law Firm, PA, both of Charleston, for Respondent.

Justice HEARN.

Appellants South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management, and South Carolina Coastal Conservation League appeal the final order of the Administrative Law Court reversing the denial of Respondent Jerry H. Risher's critical area permit application to construct a bridge over a portion of wetlands contained within his property on Fripp Island, South Carolina. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Risher is the record owner of a 0.475 acre piece of property identified as Lot 1, Block B, Subdivision 13, Fripp Island and Beaufort County, South Carolina (Lot). The Lot consists of 0.269 acres of upland high ground (buildable portion), and the remainder, which partially surrounds the buildable portion, is composed of wetlands. The Lot abuts a man-made, paved, non-vehicular foot/bike path on one side, which is maintained by the Fripp Island Property Owners Association.

One year prior to Risher's purchase of the Lot, his predecessor in title applied with the South Carolina Department of Health and Environmental Control (DHEC) and was approved for a critical area permit to construct a vehicular bridge across the non-buildable wetland portion of the Lot, connecting with the nearest vehicular road, Tarpon Boulevard. Risher purchased the Lot in 1997 and testified he understood his purchase to include the bridge permit.[1] Risher did not have the funds to construct the bridge pursuant to the permit immediately after his purchase; therefore, the Lot remained undeveloped.

In 2006, Risher contracted with O'Quinn Marine Construction, Inc. to construct a bridge similar to the one previously submitted and approved by his predecessor in title. To that end, Risher submitted a permit application to DHEC's Office of Ocean and Coastal Resource Management (OCRM). The application requested permission to construct a concrete bridge measuring twelve feet wide, eighty-five feet long, at a

---

1. The permit awarded to Risher's predecessor in title is not an issue before the Court, as Risher failed to act on the permit prior to its expiration.

height of three feet above the existing wetland grade. OCRM took the matter under advisement, but ultimately denied Risher's application based on its finding that the upland buildable portion of the Lot qualified as a coastal island which was too small to allow bridge access.

After exhausting DHEC's review options, Risher filed a Request for a Contested Case Hearing with the Administrative Law Court (ALC). Subsequently, both the South Carolina Attorney General's office and the South Carolina Coastal Conservation League filed motions to intervene before the ALC, which were granted. A hearing was held, and the ALC issued an order reversing DHEC's denial of Risher's permit request. The State filed a motion to alter or amend the judgment seeking to be dismissed as a party from the action. The State's motion was granted, and thereafter the ALC issued an amended final order noting the State's dismissal. Both DHEC and the Conservation League (collectively Appellants) appeal the ALC's determination and present the following issues to the Court on appeal:

I.   Did the ALC err as a matter of law in admitting the opinion testimony of an unqualified witness and then relying upon that testimony for the basis of its decision?

II.  Did the ALC err in making itself a witness, when it made findings and conclusions based on its own on-site inspection?

III. Is the decision of the ALC supported by reliable, probative, and substantial evidence in the record?[2]

## STANDARD OF REVIEW

■ The Administrative Procedures Act establishes this Court's standard of review for cases decided by the ALC and is set forth in Section 1–23–610(B) of the South Carolina Code (Supp.2009), which provides:

The review of the administrative law judge's order must be confined to the record. The court may not substitute its judgment for the judgment of the administrative law judge

---

2. This issue addresses Appellants' combined issues two and four, which argue the ALC's determination that the Coastal Island Regulations are inapplicable to Risher's permit application, is unsupported by substantial evidence in the record.

as to the weight of the evidence on questions of fact. The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

A decision of the ALC should be upheld, therefore, if it is supported by substantial evidence in the record.

## LAW/ANALYSIS

### I. Qualifications of Testifying Witness

■ Appellants first assert the ALC erred in admitting the opinion testimony of an unqualified witness and then relying upon that testimony for the basis of its decision. We disagree.

Lorick Fanning was called to testify on behalf of Risher. As will soon become apparent, Appellants consistently objected to Fanning's ability to testify as to the facts and circumstances of this case, as well as the conclusions he drew therefrom. On appeal, Appellants assert the ALC committed reversible error in allowing Fanning to repeatedly testify beyond the scope of what they perceived to be his area of expertise.

Fanning held undergraduate degrees in geology and forestry and had continuing education courses in land surveying, forestry, wetlands, and hydric soils, in addition to being registered as both a land surveyor and a forester in the State. The ALC qualified Fanning as an expert in forestry and land surveying, and, over objection, in the identification of wetland boundaries, including critical area boundaries. In support of his qualifications, Fanning testified he had delineated wetlands "at least 1000 times," with the vast majority of those delineations dealing with coastal topography and critical area deter-

minations. Later in his testimony, Fanning described the role that soil interpretations play in the analysis of wetland boundary determinations, relying on his academic background in hydric soils as well as his degree in geology; however, Fanning did not hold himself out as an expert in soil classification. Again, over objection, the ALC permitted Fanning to testify as to the role soils played in his determination of the Lot's wetland and critical boundary.

Shortly thereafter, Appellants further objected to Fanning's ability to testify as to whether the Lot was a part of Fripp Island, based on his own performance of a mean high water survey.[3] The ALC overruled Appellants' objections, and Fanning was permitted to testify that the Lot was indeed a part of Fripp Island. Appellants again objected to Fanning's testimony regarding whether or not the Lot was an integral part of the surrounding area's estuarine system.[4] Here, the ALC initially sustained Appellants' objection regarding Fanning's qualifications to testify; however, the court later reversed its ruling on Appellants' objection and allowed Fanning to be recalled for the purpose of testifying as to his opinion on the Lot's inclusion in the estuarine system.

"To be competent to testify as an expert, a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony." *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997) (citation omitted); Rule 702, SCRE ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an

---

3. The definition of mean high water and its relevance to the ALC's determination of whether the Lot is subject to DHEC's coastal island regulation is thoroughly developed in issue three below.

4. An estuary, although not defined in our code of laws or regulations, has been defined as a "part of a river or stream or other body of water having unimpaired connection with the open sea, where the sea water is measurably diluted with fresh water derived from land drainage." 16 U.S.C.A § 1453(7) (2000).

opinion or otherwise."). "Qualification depends on the particular witness' reference to the subject." *Gooding*, 326 S.C. at 253, 487 S.E.2d at 598.

"The qualification of a witness as an expert and admissibility of his testimony are matters largely within the discretion of the trial judge; however, the exercise of this discretion will be reversed where an abuse of discretion has occurred." *Payton v. Kearse*, 329 S.C. 51, 60–61, 495 S.E.2d 205, 211 (1998) (citation omitted). As discussed in a recent opinion of this Court, trial courts have a gatekeeping role with respect to all evidence sought to be admitted under Rule 702. *State v. White*, 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009).

In the discharge of its gatekeeping role, a trial court must assess the threshold foundational requirements of qualifications and reliability and further find that the proposed evidence will assist the trier of fact. The familiar evidentiary mantra that a challenge to evidence goes to "weight, not admissibility" may be invoked only after the trial court has vetted the matters of qualifications and reliability and admitted the evidence.

*Id.*

In support of their contention that Fanning was unqualified to give his opinions on a variety of pertinent subjects, Appellants rely on two principal cases: *Nelson v. Taylor*, 347 S.C. 210, 553 S.E.2d 488 (Ct.App.2001); and *State v. Ellis*, 345 S.C. 175, 547 S.E.2d 490 (2001). We disagree. The record shows the ALC properly considered both the amount and quality of Fanning's educational qualifications in the first instance, as well as the reliability of the proffered testimony on each subject once he was duly qualified. The court was vigilant in its efforts to ensure Fanning's testimony did not go beyond the scope of his expertise, and correctly decided that the matters upon which he testified were subjects about which he could reliably address. Consequently, the ALC did not abuse its discretion in either qualifying Fanning or in admitting his testimony.

## II. Onsite Inspection by the ALC

Appellants next contend the ALC erred in making itself a witness when it made findings and conclusions based

on its own on-site inspection. We find this issue is not preserved for review.

Following the close of all the evidence, the ALC decided *sua sponte* to view the lot on his own. Both parties consented on the record to his proposed visit. Following the judge's on-site inspection, he issued an order containing the following factual findings:

> Based on this Court's own inspection of the Petitioner's lot, it is possible to walk unassisted and without crossing any standing water from Tarpon Blvd. to the 0.269 acres of high ground at the location of the bridge proposed in the Permit Application.

The ALC also included the following footnote after this finding of fact:

> Petitioner's lot was admitted into evidence at the Court's suggestion and with the consent of all parties. On December 11, 2008, this Court inspected Petitioner's lot at low tide, giving special attention to the area that the proposed bridge would cross. I was left with a lasting impression that if the area between Tarpon Blvd. and the upland portion of Petitioner's lot was mowed, it would look like a lawn. Moreover, I could walk across that area without getting mud on my shoes.

Appellants, relying on Rule 605, SCRE, argue that a presiding judge should not testify in a trial as a witness. While Appellants acknowledge that the ALJ did not actually "testify," they maintain he clearly testified in his final order "when it was too late for any party to object or to even attempt to cross-examine or rebut this new witness."

■ The ALC, as the ultimate finder of fact in this action, was free to visit the Lot and draw its own conclusions therefrom. *See Brown v. S.C. Dep't of Health & Envtl. Control,* 348 S.C. 507, 512, 560 S.E.2d 410, 413 (2002) (stating the ALC acts as the fact-finder in reviewing permitting decisions and is not restricted by the findings of the administrative agency); *see also Sea Pines Plantation Co. v. Wells,* 294 S.C. 266, 273–74, 363 S.E.2d 891, 895–96 (1987) (approving the ability of a trial judge, also acting as a trier of fact, to conduct an on-site inspection of the premises in question). The Chief Justice makes a persuasive argument concerning the problems that

result from an ALC's inclusion of facts and observations not otherwise admitted as evidence, but when the ALC here included its first-hand observations of the Lot in its final order, Appellants failed to file a motion for reconsideration or a motion to alter or amend the judgment pursuant to Rules 29 or 68 of the Rules of Procedure for the Administrative Law Court, or Rules 59(e) or 60, SCRCP.[5]  Consequently, we decline to reach the merits of Appellants' contention because, in our view, it is unpreserved for this Court's review.  *See Brown*, 348 S.C. at 519, 560 S.E.2d at 417 (stating issues not raised to and ruled upon by the ALC are unpreserved for appellate review).

## III.  Substantial Evidence to Support the ALC's Final Order

■■■ Finally, Appellants contend the ALC erred in concluding the Lot was exempt from Coastal Island Regulation because it was part of Fripp Island.  We disagree.

The ALC found the South Carolina Coastal Zone Management Act [6] did not apply for three distinct and equally dispositive reasons.  The ALC first determined the Lot was exempted from regulation establishing access to coastal islands under Regulation 30–12.N because Fripp Island was expressly excluded by the General Assembly's definition of coastal island in Regulation 30.1.D(11).  23A S.C.Code Ann. Regs. 30–12.N (Supp.2009); 23A S.C.Code Ann. Regs. 30–1.D(11).  Regulation 30–12.N explains that the section applies to applications

---

5.  At the time this case was before the ALC, the issue of whether or not a Rule 59(e) motion was cognizable to an ALC had not been decided. This Court's pronouncement in *Home Medical Systems, Inc. v. South Carolina Department of Revenue*, 382 S.C. 556, 677 S.E.2d 582 (2009), which definitively stated that Rule 59(e) motions were permitted in ALC proceedings, was not published until April 20, 2009. *Id.* at 563, 677 S.E.2d at 586.  However, despite any uncertainty that might have existed prior to *Home Medical Systems*, this Court has long enforced and relied upon issue preservation rules in administrative appeals. *Id.* at 562–63, 677 S.E.2d at 586.

6.  23A S.C.Code Ann. Regs. 30–1 *et seq.* (Supp.2009).  Throughout the order, the ALJ refers to the regulations involved in this case as the "Coastal Zone Management Act." These regulations are, of course, not the Act itself, but instead are the regulations implementing and carrying out the provisions of that Act.

for permits for bridges and docks as a means of obtaining access to coastal islands. Regulation 30–1.D(11) defines a coastal island as: "an area of high ground above the critical area of delineation that is separated from other high ground areas by coastal tidelands or waters." The definition of coastal island further states, in pertinent part, that:

The purpose of this definition is to include all islands except those that are essentially mainland, i.e., those that already have publicly accessible bridges and/or causeways. The following islands shall not be deemed a coastal island subject to this section due to their large size and developed nature: ... Fripp Island....

*Id.* § 30–1.D(11).

The State called as a witness Sidney C. Miller, who was duly qualified as an expert in the field of tidal datum.[7] Miller undertook a study of the Lot in order to compare the Lot's elevation to the benchmark tidal data which had previously been compiled by the National Oceanic and Atmospheric Administration (NOAA). Miller, in a previous employ, oversaw NOAA's project to establish tidal boundaries for South Carolina's coast. One of the points NOAA selected to benchmark was the Hunting Island Bridge (Bridge),[8] which connects Fripp Island to Hunting Island to the north. Using the data collected by the tide gauge at the Bridge, which was collected by NOAA over the course of three years and established mean high water (MHW), mean high high water (MHHW), mean low water (MLW), mean low low water (MLLW) and various other tidal datums,[9] Miller measured the elevations at the Lot. Miller's calculations revealed no portion of the Lot was *below*

---

7. Tidal datum can be loosely defined as measurements of the sea level, accounting for different water depths and the heights of tides over the course of a certain period of time.

8. Hunting Island Bridge is alternately referred to as Fripp Island Bridge in the record, but they are, in fact, one in the same.

9. The coast of South Carolina experiences semi-diurnal tides, i.e. two high tides and two low tides in a twenty-four-hour day. Of the two high tides, one is generally higher than the other. "Mean high water" is defined as the nineteen-year average height of all the high tides at a given location over the nineteen-year tidal datum cycle. "Mean high high water" is defined as the nineteen-year average of all the higher of the two daily high tides at a given location.

MHW or MHHW, and in fact, the lowest spot of the Lot "is about a foot above mean high water." This conclusion was later confirmed by both of Risher's experts, David Youmans and Fanning, and was undisputed by Appellants.

The ALC determined that because the Lot was contiguous to land agreed to by all parties as being part of Fripp Island, and no portion of the Lot was lower than the established MHW or MHHW marks, then it was also a part of Fripp Island. Based on Regulation 30–1.D(11)'s exclusion of Fripp Island from its definition of a "coastal island," the ALC found the requirements of Regulation 30–12.N inapplicable. The court's determination of whether or not the Lot is a part of Fripp Island is not a legal question that is determined under the rubric of a regulation; instead, it is a finding of fact properly left within the purview of the fact finding body, and only reversible if unsupported by substantial evidence in the record.

A reviewing court may reverse or modify an administrative decision if the findings of fact are not supported by substantial evidence. S.C.Code Ann. § 1–23–380(A)(6)(e) (2005). "Substantial evidence is 'evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached.'" *Southeast Res. Recovery, Inc. v. S.C. Dep't of Health & Envtl. Control,* 358 S.C. 402, 407, 595 S.E.2d 468, 470 (2004) (quoting *Lark v. Bi–Lo, Inc.,* 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Palmetto Alliance, Inc. v. Pub. Serv. Comm'n,* 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984).

In our view, the ALC's determination that the Lot is a part of Fripp Island, based on the tidal datum introduced at trial, is a reasonable one which is supported by substantial evidence. *See Bursey v. S.C. Dep't of Health & Envtl. Control,* 369 S.C. 176, 188–89, 631 S.E.2d 899, 906 (2006) (stating where conflicting evidence exists as to an issue, the Court's substantial evidence standard of review defers to the findings of the fact-finder). Because this issue is dispositive of OCRM's sole

reason of denying Risher's permit,[10] it is unnecessary for the Court to address the remaining grounds on which the ALC based its final order.[11] *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

Based on the foregoing, the decision of the ALC is **AF-FIRMED.**

PLEICONES, BEATTY and KITTREDGE, JJ., concur.
TOAL, C.J., concurring in a separate opinion.

Chief Justice TOAL.

I concur with the majority but write separately to address the ALJ's site visit. While I agree that a judge sitting as the finder of fact may make a site visit, I believe that in this case the ALJ improperly found new facts upon the visit and impermissibly based the order upon those facts.

I agree with Appellant that the ALJ improperly found his own facts during his site visit and impermissibly based his order upon those findings. Recently, in *Tarpley v. Hornyak*, 174 S.W.3d 736 (Tenn.Ct.App.2004), the Tennessee Court of Appeals thoroughly discussed the various state approaches to site visits by judges. In that case, the trial judge visited the site where a bridge allegedly caused a creek to flood a nearby property. The judge viewed the flood as it was happening and determined the bridge was causing the waters to back up and therefore was a nuisance. *Id.* at 738–39. The reviewing court

---

10. As the ALC noted, OCRM also denied the permit application based on the mistaken assumptions that Risher did not own the land where the proposed bridge would connect with Tarpon Boulevard. However, Risher presented contrary evidence at the hearing indicating that he did, in fact, own the land connecting to Tarpon, and such evidence was not rebutted by Appellants.

11. Appellants also contended the ALC erred in finding: (1) the Lot was exempted from Regulation 30–12.N based on the Regulation's definition of "upland areas"; and (2) that the Lot was not a part of the surrounding Estuarine System.

of appeals found the judge based his ruling on his own observations at the site, rather than on the evidence presented by the parties. *Id.* at 740.

In determining whether the judge's observations during the site visit and reliance upon those observations was error, the reviewing *Tarpley* court first considered whether a fact-finder's observations are evidence. *Id.* at 742. The court first discussed Wigmore's position that the view is evidence, but only because the view is limited to matters that can be directly perceived without making an inference. *Id.* The *Tarpley* court explained that in the case before it, the only fact that could properly be determined from the site visit was that the land was flooded; the trial judge had to infer the flooding was caused by the bridge. *Id.* After reviewing multiple cases from other jurisdictions, the court held that a view may only be used to understand evidence already in the record, not to find new facts. *Id.* at 742–43. Thus, the court found the most important question was not whether the observations from a view are evidence, but rather what use a judge makes of those observations. *Id.* at 744.

The *Tarpley* court then explained that because a view is only properly used to assist in understanding the evidence presented, a fact-finder may not base his ruling upon the information observed during a view. *Id.* at 745. The court found two important considerations for this limitation: a judge cannot be a witness in a case before him, and facts found during a view are not preserved in the record for appellate review. *Id.* at 746–48. Thus, the *Tarpley* court aligned with the majority of jurisdictions, holding:

> [A] trial judge has the inherent discretion to take a view of the site of a property dispute, a crime, an accident, or any other location, where such a view will enable the judge to assess the credibility of witnesses, to resolve conflicting evidence, or to obtain a clearer understanding of the issues. However, the view cannot be made to obtain additional evidence or to replace the requirement that evidence be produced at trial with the judge's personal observations of the site. Thus, the proper purpose of a view is to enable

the judge to better understand the evidence that has been presented in court, not as a substitute for such evidence. *Id.* at 749.

I find the Tennessee court's analysis and conclusion correct, and in the absence of South Carolina cases discussing this issue, would adopt the Tennessee approach.

In my view, two vital considerations ought to bear on the outcome of this case: the great deference accorded an administrative tribunal's finding, and the necessity for a full and accurate record. The bright line rule of review for administrative tribunals is that we will uphold a tribunal's finding if it is supported by substantial evidence in the record. S.C.Code Ann. § 1–23–380 (Supp.2009); *Lark v. Bi–Lo, Inc.,* 276 S.C. 130, 135–36, 276 S.E.2d 304, 307 (1981). To ensure this deferential standard remains appropriate, it is critically important that the ALJ stays firmly within his role as a judge and not bleed into other roles, such as prosecutor, expert, or witness. Allowing an ALJ to cross those boundaries creates an unpredictable environment in the courtroom. This sort of abuse and stretching of authority is precisely why some parties justifiably are displeased with administrative tribunals. Further, allowing an ALJ to gather his own evidence and base his order upon that evidence deprives the reviewing appellate court of its lifeblood: a full and accurate record of the proceedings in the trial court. The extreme deference accorded an ALJ only makes sense if the record is pure and complete. Therefore, we cannot allow a judge to present his own evidence after a site visit because that evidence is not properly in the record and is unavailable to the reviewing court.

Applying the above reasoning to the case at hand, I would find the ALJ improperly found new evidence during the site visit, and that basing his order upon that evidence was error. I concur with the result reached by the majority, however, because even without the ALJ's improper findings the record contains substantial evidence to support the ALJ's ruling.