647 S.E.2d 223

**OFFICE OF REGULATORY STAFF, Appellant,**

**v.**

**SOUTH CAROLINA PUBLIC SERVICE COMMISSION, South Carolina Telephone Association, and Verizon South, Inc., Respondents.**

**South Carolina Cable Television Association and Southeastern Competitive Carriers Association, Appellants,**

**v.**

**South Carolina Public Service Commission, South Carolina Telephone Association, and Verizon South, Inc., Respondents.**

**No. 26354.**

Supreme Court of South Carolina.

Heard Oct. 9, 2003.

Decided June 25, 2007.

Rehearing Denied July 19, 2007.

---

48

Florence P. Belser, of Office of Regulatory Staff, Frank R. Ellerbe, III and Bonnie D. Shealy, both of Robinson, McFadden, and Moore, of Columbia, for Appellants.

F. David Butler, of South Carolina Public Service Commission, M. John Bowen, Jr., Margaret M. Fox, Robert T. Bockman, all of McNair Law Firm, P.A., of Columbia, and Steven W. Hamm, of Richardson Plowden Carpenter & Robinson, of Columbia, for Respondents.

Justice BURNETT:

Appellants, the Consumer Advocate for the State of South Carolina,[1] South Carolina Cable Television Association (SCCTA) and Southeastern Competitive Carriers Association (SECCA) bring this action challenging the Public Service Commission's (Commission) implementation of the Universal Service Fund (USF). The trial court concluded the Commission's decisions regarding the State USF are supported by substantial evidence in the record. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

The concept of a USF originated when the United States Congress passed the Telecommunications Act of 1996, 47

---

1. After this case was heard, we ordered that the Office of Regulatory Staff (ORS) be substituted for the Consumer Advocate as an appellant and counsel in this matter. *See* S.C.Code Ann. § 37–6–604(C) (Supp. 2006); Rule 236(c), SCACR.

Section 37–6–604(C) states after January 1, 2005, the Consumer Advocate must not represent consumers in matters or appeals under Title 58 that are pending on January 1, 2005, and such matters shall be transferred to the ORS. Additionally, S.C.Code Ann. § 58–4–10(B) (Supp.2006) states the ORS must represent the public interest of South Carolina before the Commission and unless and until the ORS chooses not to participate, it must be considered a party of record in all filings, applications or proceedings before the Commission. For purposes of this opinion we refer to the Consumer Advocate, the appellant who initially presented the issues before the Court, but recognize the substitution of ORS as the successor to the Consumer Advocate in Title 58 matters such as this appeal.

U.S.C. § 609 (2002). The Telecommunications Act was intended, in part, to promote an initiative of "universal service." Congress hoped that a nationwide telecommunications policy of "universal service" would ensure access to basic telephone service at affordable rates for all Americans.[2] Congress did so by mandating that the new system of universal service be "explicit," *i.e.*, not dependent upon implicit subsidies. 47 U.S.C. § 254(e) (2002). The Telecommunications Act provides "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d) (2002). In furthering the goal of nondiscriminatory universal service, Congress gave the states authority to adopt approaches for encouraging universal service.

With the enactment of S.C.Code Ann. § 58-9-280(E) (Supp. 2006), the South Carolina General Assembly authorized the Commission to establish a USF for South Carolina. The Commission held three proceedings to address implementation strategies for the fund. The first proceeding established the size of the USF as directed by S.C.Code Ann. § 58-9-280(E). *In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 97-753 (S.C. Pub. Serv. Commn. Sept. 3, 1997). The second proceeding determined the appropriate cost models and sizing of South Carolina's

---

2. Before the Telecommunications Act, universal service was promoted through a system of implicit subsidies. Under the pre-Telecommunications Act plan, incumbent local exchange carriers charged some customers above-cost rates to offset the difference for those customers charged below-cost rates. Congress determined that the system of implicit subsidies stifled competition. Under the "implicit subsidy system," a telephone company agreed to provide services for all customers within its territory. In return, the State promised to set rates that would ensure the telephone company profited from its efforts. Competitors, which were not bound by this agreement with the State, targeted customers who were paying above-cost rates. Consequently, the implicit subsidies that funded universal service were lost when an incumbent local exchange carrier lowered its rates to compete with its competitors or lost its high paying customers, which funded universal service. *See In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 98-322 (S.C. Pub. Serv. Commn. May 6, 1998).

USF.[3] *In re Proceeding to Establish Guidelines for an Intra-state Universal Service Fund,* Or. No. 98–322 (S.C. Pub. Serv. Commn. May 6, 1998). The Commission selected a forward-looking cost proxy model for non-rural companies and the Benchmark Cost Proxy Model as the state forward-looking cost model for BellSouth, GTE, and Sprint/United. The Commission adopted the South Carolina Telephone Coalition's (SCTC) embedded cost model for rural local exchange carriers.[4] In the third proceeding, the Commission addressed various outstanding issues relating to the implementation of the fund.[5] *In re Proceeding to Establish Guidelines for an*

---

3. Section 58–9–280(E)(4) provides the size of the fund is the sum of the difference, for each carrier of last resort, between its costs of providing basic local exchange services and the maximum amount it may charge for the services.

 The cost models are used to calculate the cost of providing universal service. As explained by the Commission, cost models are needed to determine the size of the implicit subsidy built into current rates that allow incumbent local exchange carriers to sustain low charges for basic services.

4. "Local exchange carrier" means either an incumbent local exchange carrier or a new entrant local exchange carrier. S.C.Code Ann. § 58–9–10(12) (Supp.2006).

 An "incumbent local exchange carrier" means a telecommunications company, its affiliates, successors, or its assigns, which provide local exchange service pursuant to a certificate of public convenience and necessity issued by the commission before July 1, 1995, or operating as a local exchange carrier before that date pursuant to commission authority, to provide local exchange service within a certificated geographic service area of the state. S.C.Code Ann. § 58–9–10(11) (Supp. 2006).
 "Basic local exchange telephone service" means for residential and single-line business customers, access to basic voice grade local service, with touchtone, access to available emergency services and directory assistance, the capability to access interconnecting carriers, relay services, access to operator services, and one annual local directory listing (white pages or equivalent). S.C.Code Ann. § 58–9–10(9) (Supp.2006).

5. Order No. 2001–419 primarily makes public policy findings regarding the fund. The Commission also opted for a phased-in approach from implicit to explicit support. The Order also discusses how the fund operates. Before an incumbent local exchange carrier can qualify for funding from the USF, it must reduce rates containing implicit support, dollar for dollar.

 Order No. 2001–419 also requires that any local exchange carrier applying for funding from the State USF file detailed cost data with the Commission showing that implicit support exists in the rates that are

*Intrastate Universal Service Fund,* Or. No. 2001–419 (S.C. Pub. Serv. Commn. June 6, 2001).

Appellants now challenge the Commission's findings arising out of these proceedings.

## ISSUES

I. Did Appellants bring a timely appeal of Commission Orders 98–322, 97–753, and 97–942 [6]?

II. Is the USF, as established and implemented by the Commission, "specific, predictable and sufficient" in accordance with Section 254(f) of the Federal Telecommunications Act and does the fund comply with S.C.Code Ann. § 58–9–280(E)(4)?

Is Section 254(f) of the Federal Telecommunications Act violated because the State USF burdens federal universal support mechanisms?

III. Does the State USF bar competitive entry in violation of Section 253 of the Federal Telecommunications Act?

IV. Does the State USF fail to match costs and revenues in violation of S.C.Code Ann. § 58–9–280(E)?

V. Did the Commission allocate 25% of network costs to federal jurisdiction, and if the Commission did not make such an allocation, did it violate FCC regulations?

VI. Does the evidence in the record support the Commission's finding that intrastate access charges are priced above cost and provide a significant implicit subsidy to basic local service?

## LAW/ANALYSIS

 The findings of the Commission are presumptively correct and have the force and effect of law. Therefore, the burden of proof is on the party challenging an order of the Commission to show it is unsupported by substantial evidence and the decision is clearly erroneous in view of the substantial

---

proposed to be reduced. This is another method by which the Commission maintains sufficient control over the fund.

**6.** *In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 97–942 (S.C. Pub. Serv. Commn. Dec. 31, 1997).

evidence on the whole record. *Heater of Seabrook, Inc. v. S.C. Pub. Serv. Comm'n,* 332 S.C. 20, 27 n. 4, 503 S.E.2d 739, 742 n. 4 (1998). Substantial evidence is something less than the weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984).

Because Appellants have failed to prove the Commission's implementation of the State USF is clearly erroneous, we affirm.

The Commission's orders are meticulous in their factual determinations and decisions regarding the appropriate methods for implementing the State USF. The orders issued by the Commission throughout its consideration of the USF show careful consideration of numerous proposals on the fund's implementation. *See e.g.,* Or. No. 97–753 (Sept. 3, 1997); Or. No. 97–942 (Dec. 31, 1997); Or. No. 98–322 (May 6, 1998); Or. No. 2001–419 (June 6, 2001). The orders alone and the orders for which the Commission considered motions for reconsideration have presented an insurmountable hurdle for Appellants in refuting the Commission's conclusion substantial evidence supports its decisions in developing the intricacies of the fund. Before addressing Appellants' specific legal arguments, we discuss these orders to show how the Commission arrived at its decisions regarding the fund and to illuminate the evidence considered by the Commission in arriving at its decisions.

Order No. 98–322 is especially illustrative of the Commission's decision-making process. Under the Federal Telecommunications Act, states faced an April 24, 1998 deadline to submit to the Federal Communications Commission (FCC) a cost model for calculating federal support for non-rural incumbent local exchange carriers serving rural, insular and high cost areas. States failing to select a study satisfying FCC criteria, or states failing to submit a study, would be required to follow the FCC's cost model for federal universal service. Not only did the Commission attempt to adopt a model consistent with the FCC guidelines,[7] it elected to adopt the

---

7. At the time Order No. 98–322 was issued, the FCC had not yet selected a cost model for federal universal service funding, but was considering various proposals.

FCC's criteria in establishing the intrastate USF.[8] In Order 98–322, the Commission primarily considered which cost proxy model to adopt.[9] In particular, the Commission evaluated the pros and cons of the Benchmark Cost Proxy Model Version 3.1 (BCPM 3.1) and the Hatfield Model Version 5.0a (HM 5.0a). The Commission meticulously weighed the characteristics of each model. One consideration was which model more accurately locates customers in rural and other high cost areas. Locating customers in high cost areas is an essential function in estimating the requisite amount of funding for the state universal service plan. The Commission ultimately selected the BCPM 3.1, in part, because it found the HM 5.0a geocoding process inferior in large rural areas. Furthermore, the Commission carefully weighed the testimony of various cost experts. For example, in selecting the BCPM 3.1, the Commission found its network to be superior to that of the HM 5.0a. A witness for AT & T testified that the HM 5.0a followed standard engineering design rules.[10] The Commission, however, determined the AT & T witness could not substantiate his claim and considered testimony of other witnesses who agreed that the BCPM 3.1 followed standard engineering practices. *Id.*

The Commission also painstakingly addressed the arguments of the parties on their motions for reconsideration. *See e.g., In re Proceeding to Establish Guidelines for an Intra-*

---

8. This demonstrates the Commission's intention to fully comply with federal guidelines—a point Appellants attempt to refute. The Commission was free to develop its own guidelines.

 The Commission also designated itself to oversee the fund because it found if it did not select a cost model, a federal cost model may not be in South Carolina's best interest if this State's amount of federal support was to be determined by a federal model based upon national average default inputs.

9. The Commission considered highly technical testimony on cost proxy models. It is clear from the record the Commission carefully considered the advantages and disadvantages of various models and clearly documented its findings.

10. We omit a technical discussion of network design because it is irrelevant to the ultimate issue of whether the Commission's findings are supported by substantial evidence. For efficiency purposes, we have selected examples from the record reflecting the Commission's thorough evaluation of the cost models.

*state Universal Service Fund,* Or. No. 98–201 (S.C. Pub. Serv. Commn. March 17, 1998); *In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 2001–704 (S.C. Pub. Serv. Commn. Aug. 31, 2001). For example in Order No. 2001–704, the Commission carefully considered the arguments of the Consumer Advocate, an Appellant in this case. In that order the Commission noted it had held extensive proceedings in the five previous years addressing guidelines for the USF, cost models, and methodologies. On the cost methodology issue alone, the Commission heard the testimony of over twenty economic, engineering, and cost experts. The Commission went on to carefully consider the Consumer Advocate's arguments, which are raised again on appeal and discussed below. We turn now to the issues raised by Appellants.

## I.

█ SCCTA, SECCA, and the Consumer Advocate have timely appealed Commission Order 98–322, which addressed the cost studies to be employed by the Commission in sizing South Carolina's USF. Commission Order No. 98–322 is not a final order because the order leaves further acts to be done by the Commission. *S.C. Dep't of Transp. v. Faulkenberry,* 337 S.C. 140, 146, 522 S.E.2d 822, 825 (Ct.App.1999). Appellants' SCCTA and SECCA correctly point out that in subsequent orders the Commission itself noted that it had not issued a final judgment on issues relating to the size of the USF. In *In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 2000–0518 (S.C. Pub. Serv. Commn. June 21, 2000), the Commission specifically noted it had not yet considered issues such as "whether only intrastate revenues may be taxed to create the fund, whether wireless revenues may be taxed, and how the Commission can and should deal with the elimination of implicit subsidies." The Consumer Advocate correctly argues that the Commission ultimately determined the size of the fund in *In re Proceeding to Establish Guidelines for an Intrastate Universal Service Fund,* Or. No. 2001–419 (S.C. Pub. Serv. Commn. June 6, 2001) and disavowed previous estimates. The Commission's orders relating to the size and funding of the State USF cannot be read in isolation. Until the Commission issued

Order 2001–419, the Commission's orders allowed for modification as the particular strategy for implementation developed. Therefore, we reverse the trial court's finding on this issue.

SCCTA's and SECCA's appeal of Commission Order Nos. 97–753 and 97–942 are also properly before the Court. Order No. 97–753 delineated guidelines for the State USF, determined the Commission would be the fund's administrator, and estimated the size of the fund.[11] In Order No. 97–753, the Commission specifically noted that certain issues relating to the fund would be decided in the future. Order No. 97–942 clarified issues discussed in Order No. 97–753 and held that the actual size of the fund would be determined *de novo* in future proceedings. Appellants were not required to appeal within thirty days after issuance of this order pursuant to S.C.Code Ann. § 1–23–380(A)(1) (2005) because the order was not final. The hearings in 1999 and 2000 left various issues to be resolved. It was not until 2001 that the Commission issued final orders from which Appellants now timely appeal.[12]

## II.

■ SCCTA and SECCA argue the fund violates Section 254(f) of the Federal Telecommunications Act because the Commission does not have sufficient control over the establishment, growth or operation of the fund. Section 254(f) of the Federal Telecommunications Act specifically requires a plan set forth "specific, predictable, and sufficient" mechanisms of control.[13]

---

11. Respondent South Carolina Telephone Association (SCTA) proposed the guidelines for the fund. Under the SCTA plan, incumbent local exchange carriers reduce prices for intrastate services that include implicit support for universal service to offset the gross amount received from the USF.

12. Order No. 2001–419 created the fund and was the first final order. SCCTA and SECCA filed a motion for reconsideration and then filed this appeal.

13. "A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement

SCCTA and SECCA fail to prove the Commission's findings relating to its control over the fund are erroneous. The record shows the Commission does, in fact, have sufficient control over the size of the fund. The Commission has twice changed the estimate of the actual size of the fund suggesting it has sufficient control over the fund's size.[14] Testimony by experts before the Commission indicates these estimates are still subject to modification. Testimony indicates the Commission will be reviewing any further implementation and the Commission has full oversight. Gary Walsh, Executive Director of the Commission, provided detailed testimony on how certain variables can cause the estimated size of the fund to fluctuate. Testimony also showed the $340 million estimate was calculated using the formula mandated by the General Assembly. Under the SCTA's plan, the support per line changes when there is a new cost study. After the Commission reduces rates and allocates support for half of the $340 million, the Commission would conduct another cost study. Through this review process the Commission maintains control over the size of the fund.[15]

The record further reflects the Commission has imparted control mechanisms to ensure its control over the size of the fund by requiring incumbent local exchange carriers that apply for funding beyond the initial access step, file detailed cost data reports. The local incumbent exchange carriers must also update their cost studies before they can implement more than one-third of its company specific funding requirement.

---

of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent such regulations adopt additional *specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.*" 47 U.S.C. § 254(f) (emphasis added).

14. The Commission initially estimated that the fund would be around $439.7 million, and later lowered that figure to $340 million.

15. We note our ruling would not preclude future reviews of challenges to the fund's size. We suggest the Commission engage in periodic review of the fund's size to enhance the requirements of federal and state law.

Control of the fund is also accomplished through the Commission's phased-in approach. The phased-in approach allows a gradual transition from the implicit support system to an explicit funding system. The phased-in approach permits local exchange carriers to receive additional universal service funding to remove implicit support if the local exchange carriers can show the Commission that implicit support exists in particular rates. This process illustrates another method by which the Commission maintains control of the fund.

Further, the mechanism does not lack specificity and predictability because the term "implicit subsidies" is undefined. As Respondents point out, the term implicit subsidy has been repeatedly discussed throughout the Commission's proceedings. It is also true the FCC has likewise found it unnecessary to define the term. Sixth Report and Order in CC Docket Nos. 96–262 and 94–1, Report and Order in CC Docket Nos. 96–262 and 94–1, Report and Order in CC Docket No. 99–249, Eleventh Report and Order in CC Docket No. 96–45, FCC 00–1893 (released May 31, 2000) at ¶¶ 3, 23–24.

The State USF does not violate South Carolina Code Ann. § 58–9–280(E)(4). This statute specifically determines the size of the fund. The size of the fund is the difference between the cost of providing basic local exchange service for each carrier of last resort and the maximum amount the carrier could charge.[16] The Commission noted in Order No. 97–953 it must comply with the requirements of the Code, but "the size of the fund must be adjusted over time as cost models are employed by the Commission and actual funding is required." The sizing of the fund is flexible because variables such as federal funding, subscriber line charge, and cost requirements determined by updated studies may continually affect the fund's size.

---

16. A "carrier of last resort" means a facilities-based local exchange carrier, as determined by the Commission, not inconsistent with the Federal Telecommunications Act of 1996, which has the obligation to provide basic local exchange service, upon reasonable request, to all residential and single-line business customers within a defined service area. Initially, the incumbent local exchange carrier must be a carrier of last resort within its existing service area. S.C.Code Ann. § 58–9–10(10) (Supp.2006).

■ SECCA and SCCTA argue another violation of Section 254(f) in that the State USF imposes an impermissible burden on federal universal support mechanisms.[17] SECCA and SCCTA contend that the State fund burdens the federal fund because the Commission's plan assesses contributions to the State USF on interstate and intrastate revenues. In other words, the State USF imposes an additional surcharge on the same interstate revenues subject to the federal surcharge for the federal USF.

We agree with the trial court's analysis on this issue. Both the trial court and the Commission determined that including interstate revenues does not burden federal universal support mechanisms. SECCA and SCCTA cite *AT & T Communications v. Eachus*, 174 F.Supp.2d 1119 (D.Or.2001) in support of their position. *Eachus* was decided subsequent to *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir.1999) (*TOPUC*). In *TOPUC*, the court held that the FCC lacked jurisdiction to assess intrastate revenues because of a statutory limitation on its jurisdiction. The *TOPUC* case dealt only with the FCC's jurisdiction, not the states' jurisdiction, and therefore has no relevance in the present case. Relying on *TOPUC*, the *Eachus* court did, in fact, hold the assessment of interstate revenues for a state fund burdens the federal support mechanism. We believe the case was incorrectly decided. In *Eachus*, the court concluded if interstate carriers are assessed for both state and federal funds, then the carriers are burdened and therefore the federal mechanism is burdened. 174 F.Supp.2d at 1124. Clearly, the burden on carriers and the burden on the federal support mechanism are not necessarily synonymous.[18]

We conclude substantial evidence demonstrates the State USF does not violate Section 254(f).

17. 47 U.S.C. § 254(f) states that the mechanisms states adopt cannot burden universal support mechanisms.

18. The Connecticut Supreme Court has recently stated an overlap in terms of revenues being assessed for both state and federal funds does not suggest that federal funding mechanisms have been relied on or burdened. *Bell Atl. Mobile, Inc. v. Dep't of Pub. Util. Control*, 253 Conn. 453, 754 A.2d 128, 148 (2000).

## III.

■ SECCA and SCCTA argue the State USF violates the Federal Telecommunications Act because it is not competitively neutral and acts as a barrier to competition.[19] A close analysis of how the USF operates reveals Appellants have failed to prove the fund operates on a discriminatory basis. Essentially, SECCA and SCCTA argue the USF, as currently adopted by the Commission, functions to discriminate against competitive local exchange services because incumbent local exchange carriers can lower prices for competitive services and then have the reduction subsidized by the USF. Appellants' argument is only valid if competitive local exchange carriers are denied access to the funds under the Commission's plan. The record shows this is not necessarily the case. In fact, as the trial court points out, the competitive local exchange services may actually lose a competitive advantage with the implementation of the USF.[20] Because the implicit support becomes explicit, all companies should be able to compete on a more equal playing field. Competitive local exchange carriers will also become responsible for paying into the fund. Furthermore, competitive local exchange carriers are not denied access to the fund. Commission Order No. 2001–419 states,

> There is no earnings review requirement before a company can receive Federal Universal service funding. We likewise reject the argument that the State USF will provide [incumbent local exchange carriers] with a guaranteed level of earnings—in effect, some kind of "insurance" against competitive loss. State USF funding is portable and, as such,

---

19. Section 253 of the Telecommunications Act prohibits states from passing regulations which prohibit competitive entry and requires that a state's universal service plan be competitively neutral. 47 U.S.C. § 253(a) & (b) (2002).

20. Essentially, the trial court and Respondents argue competitive local exchange carriers seek to delay implementation of the fund because they are not currently subject to implicit support within their rates. Therefore, they can offer services at a lower cost to customers. Under the Commission's plan, competitive local exchange carriers would eventually pay into the fund therefore forcing them to increase rates and lose their competitive edge.

can be competed away just like other sources of customer revenue.

SECCA and SCCTA also argue the State USF is not competitively neutral because it only allows withdrawal of funds once a local exchange company shows that it has reduced rates to remove implicit subsidies. Therefore, only incumbent local exchange companies can withdraw funds.

While incumbent local exchange companies are initially the carriers of last resort, competitive local exchange carriers may qualify as a carrier of last resort.[21] Competitive local exchange carriers are only prohibited from receiving funds from the USF, if they choose not to undertake an obligation to provide universal service.

## IV.

SECCA and SCCTA argue the State USF fails to match costs and revenues in violation of § 59–9–280(E)(4), which requires the Commission to establish the size of the fund by calculating the difference between the "costs of providing basic local exchange services and the maximum amount it may charge for the services." SECCA and SCCTA contend that because the Commission's approach mismatches costs and revenues, the fund will ultimately be oversized.[22] Appellants' SECCA and SCCTA believe that the fund will become so over-sized that it will serve as a barrier to entry by potential competitors in contravention of the Federal Telecommunications Act.

SECCA and SCCTA have not presented substantial evidence showing that the cost models adopted by the Commission "mismatch" costs and revenues in violation of the General Assembly's directive. The Commission was specifically required to adopt cost models, which comply with the formula

---

21. The USF is available to carriers who undertake the carrier of last resort obligation. *See supra* note 16 for the meaning of the term "carrier of last resort."

22. Specifically, SECCA and SCCTA argue that the Commission's formula uses all costs associated with the facilities used by local exchange companies to provide telecommunications services, but uses revenues received from the provision of only basic local residential and business services.

set out by the General Assembly. This is precisely what the Commission did, and its decisions on appropriate cost models are supported by substantial evidence in the record. Therefore, we give deference to the Commission on this issue. In Order No. 98–322, the Commission selected an appropriate cost model and inputs that can produce reasonable cost estimates of providing universal service in South Carolina and that can meet the FCC criteria for calculation of the appropriate level of support from the federal high cost fund. In deciding on the appropriate cost model, the Commission considered the testimony of over thirty experts. The Commission carefully analyzed the two models presented to it for consideration.[23] In adopting BCPM 3.1, the Commission made a specific finding that HM 5.0a fails to accurately reflect the cost of providing universal service in South Carolina. Similarly, it made specific findings on how BCPM 3.1 does accurately reflect the cost of providing universal service in South Carolina. Or. No. 98–322. In its order, the Commission gives technical support to its finding and discusses the expert opinions of both sides in detail.[24]

The Consumer Advocate makes a similar argument questioning the Commission's adoption of certain cost methodologies. According to the Consumer Advocate, the Commission violated the Federal Telecommunications Act because it failed to fully allocate the costs of the local telephone network among all services that use the network. Section 254(k) of the Federal Telecommunications Act states,

A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more

---

23. BellSouth, GTE, and United wanted the Commission to adopt BCPM 3.1, while AT & T and MCI wanted the Commission to adopt HM 5.0a.

24. It would be impractical to discuss the scientific findings of the Commission. However, the Commission's findings are specific and consistent with a finding of substantial evidence in the record.

than a reasonable share of the joint and common costs of facilities used to provide those services.

The Consumer Advocate also argues the Commission violated S.C.Code Ann. § 58-9-280(E)(4) when it allocated the costs of the telephone network to services other than basic local service.

■ There is substantial evidence in the record showing the Commission did allocate joint and common costs to different services and did isolate the cost of providing basic local service. Witnesses for the SCTC testified that the Commission allocated joint and common costs to the various services using the network. Both the circuit court and Respondents quote the testimony of Azita Sparano [25] and Douglas Meredith [26] extensively. This testimony does reflect the Commission complied with Section 254(k) of the Federal Telecommunications Act. Meredith testified,

In order to develop an embedded cost of service for residential and business one-party service, JSI used information obtained from each cost company. . . . The financial information obtained . . . included booked investment amounts, including depreciation reserves, for investments under [47 C.F.R.] Part 32 Accounting rules. This financial information also included allowable expense amounts for the telecommunications activity of the company. *Finally, information relating to the operation of the company that relate to how shared and common investments and expenses are allocated, and the usage of the network for various types of calling activity, was obtained.* The actual cost information is allocated to department and then to functional components within department based upon the information provided by the company. These functional components are then combined to form a basic residential or business service cost. *This procedure utilizes cost allocation principles that are used in embedded cost methodologies. For instance, the switching function is allocated between local and toll calls.* The only notable exception to an embedded allocation

---

**25.** Sparano is Director of Southeast Operation of John Staurulakis, Inc. in Alpharetta, Georgia. She was a SCTC witness.

**26.** Meredith is the Director of Economic and Pricing Division of John Staurulakis, Inc. in Alpharetta, Georgia. He was a SCTC witness.

procedure that was used under our analysis is in the treatment of the loop. In the current analysis, the loop is fully allocated to the basic service. This exception is consistent with the treatment of non-traffic sensitive ("NTS") loop cost by the FCC, and is consistent with the treatment used by other companies involved in this proceeding.

The trial court also outlines testimony illustrating how the non-rural companies and Sprint/United allocated the costs of the network through inputs to BCPM 3.1. For example, one expert testified as part of the FCC's Automated Reporting Management Information System, cost data is used to assign only a fraction of the general expense categories. Id. Furthermore, in Commission Order No. 98–322, the Commission specifically found that BCPM 3.1 and the inputs proposed by BellSouth satisfied the criteria established by the FCC.

■ The Consumer Advocate raises another argument related to the cost methodologies in contesting the Commission's treatment of the local loop. We agree with the trial court and Respondents the Commission's treatment of the local loop as a direct cost was proper. The local loop is the transmission facility between the telephone company's central office and the end user's premises. 47 C.F.R. § 51.319(a) (2003). The trial court explained why the local loop is treated differently. Because the local loop is a "cost-causer," the entire cost of the loop is appropriately designated to one service. Respondents make a similar argument. Opinions on how to treat the local loop costs vary. However, treating the loop cost as a direct cost is supported by substantial evidence in the record.

## V.

■ The Consumer Advocate alleges that the trial court erred in upholding the Commission's finding it was unnecessary to allocate 25% of network costs to the federal jurisdiction. Commission Order No. 98–322 explains the origin of this 25% allocation. "After deciding upon a methodology for determining the overall size of universal service costs that required support from a subsidy source, the FCC decided to construct the federal universal service fund to cover only 25 percent of those costs. The FCC explained that under the current separations process, roughly 25 percent of the costs of

the local loop are assigned to interstate jurisdiction and, therefore, the new federal fund would cover only 25 percent of the total cost of subsidizing universal service." Or. No. 98– 322. We agree with Respondents that the split to which the Consumer Advocate refers, is not a requirement for USF cost study allocations. The Consumer Advocate cites 47 C.F.R. § 36.154(c) (2003) in support of its argument. Although, the FCC did adopt a 25/75 split, 47 C.F.R. § 36.154 is not an applicable reference to this split because it refers to an allocation of cost of services between the interstate and intrastate jurisdictions for regulatory purposes.[27] The 25% allocation to which Appellants refer was abandoned for universal service funding.

Even if a 25% allocation is required, the record reflects the Commission did allocate a portion of the cost to the federal jurisdiction by "backing out" federal support from the total USF requirement. Respondents argue the methodologies proposed by the SCTC companies take into account and back out the federal subscriber line charge, which is a direct form of federal support for universal service, as well as the actual amounts received in high cost federal universal service.[28]

## VI.

The Consumer Advocate argues that the evidence in the record does not support that intrastate access charges are priced above cost and provide a significant implicit subsidy to basic local service.[29] Access charges are those paid by long

----

27. 47 C.F.R. § 36.154(c) states, "[e]xcept as provided in § 36.154(d) through (f), effective January 1, 1986, 25 percent of the costs assigned to subcategory 1.3 shall be allocated to the interstate jurisdiction." Subcategory 1.3 includes "[s]ubscriber or common lines that are jointly used for local exchange service and exchange access for state and interstate interexchange services." The Part including these provisions is entitled "Jurisdiction Separations Procedures; Standard Procedures for Separating Telecommunications Property Costs, Revenues, Expenses, Taxes and Reserves for Telecommunications Companies."

28. Respondents outline how Sprint/United also backed out actual amounts received in universal funding. BellSouth and GTE subtracted the subscriber line charge and an estimate of additional anticipated federal support.

29. In Order No. 2001–419 the Commission reduced access charges by 50% and recovery of that amount from the State USF.

distance companies to local exchange carriers for originating and terminating long distance calls. Access charges are a significant source of implicit support for basic local exchange services. The Commission initially reduced access charges by 50% and allowed the recovery of these through the State USF. In effect, the Commission removed a portion of the implicit subsidy and converted it to the explicit USF.

There is substantial evidence in the record showing that intrastate access charges are priced above cost and provide significant support for basic local exchange service. As Respondents note, BellSouth, GTE, and the SCTC all agree an access rate of three cents is above cost for the companies.

In issuing Order 98–322, the Commission found the cost of providing service for many companies was shown to exceed the amount the company could charge for the service by $35.07–$70.81 per month. This finding was supported by testimony indicating each company could charge $8.08 to $16.15 per month for basic residential service. The record shows there are subsidies flowing from these rates.

The FCC's reform of interstate access charges, which reduced access charges and provided explicit support, bolsters Respondents' position. At the request of the Coalition for Affordable Local and Long Distance Service (CALLS), the FCC adopted a compromise proposal CALLS developed. The trial court and Respondents quoted the following language from the FCC order in support of their position illustrating why a reduction in access charges can provide explicit support.

> This "patchwork quilt" of implicit support helped keep rates largely affordable in a monopoly environment where incumbent [local exchange carriers or] LECs could be guaranteed an opportunity to earn returns from certain services and customers that are sufficient to support the high cost of providing other services to customers. The new competitive environment envisioned by the 1996 Act, however, threatens to undermine this implicit support structure over the long run. The 1996 Act removed barriers to entry in the local market, generating competitive pressures that may make it difficult for incumbent LECs to maintain access charges above economic cost. Thus, where existing rules require an incumbent LEC to set access charges above cost for a high-

volume user, a competing provider of local service can lease unbundled network elements at cost, or construct new facilities, thereby undercutting the incumbent's access charges. As competition develops, incumbent LECs may be forced to lower their access charges or lose market share, in either case jeopardizing the source of revenue that, in the past, has permitted the incumbent LEC to offer service to other customers, particularly those in high-cost areas, at below-cost prices. CALLS Order at para. 24.

## CONCLUSION

Appellants have failed to show that the Commission's decisions in establishing and implementing South Carolina's USF are unsupported by substantial evidence. Because Appellants have not met their burden of proof, we affirm in part and reverse in part.

**AFFIRMED IN PART AND REVERSED IN PART.**

MOORE, A.C.J., WALLER and PLEICONES, JJ., and Acting Justice L. CASEY MANNING, concur.